FULTON NATIONAL BANK, Claimant, Appellant,

v.

Mrs. Lucille M. TATE, Individually, and as Administratrix of the Estate of Steve C. Tate, Deceased, et al., Appellees.

No. 22467.

United States Court of Appeals Fifth Circuit.

July 14, 1966.

Frazer Durrett, Jr., Jones, Bird & Howell, Earle B. May, Jr., Atlanta, Ga., for appellant.

R. Wilson Smith, Jr., Gainesville, Ga., Wright Gellerstedt, Decatur, Ga., Hal Lindsay, Atlanta, Ga., John H. Smith, Gainesville, Ga., for appellee Tate.

Thomas L. Stapleton, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., Charles L. Goodson, U. S. Atty., Atlanta, Ga., John B. Jones, Jr., Acting Asst. Atty. Gen., Washington, D. C., Slaton Clemmons, Asst. U. S. Atty., Atlanta, Ga., of counsel, for the United States.

C. Edward Hansell, G. Dean Booth, Jr., Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for third-party defendant-appellee.

Before BROWN and COLEMAN, Circuit Judges, and GARZA, District Judge.

JOHN R. BROWN, Circuit Judge:

Beneficiaries of an estate charge the executor with breach of his duty of undivided loyalty. They prove that the executor was negotiating at the same time with the same third party for both the sale of his personal property and the lease of estate property; that after "substantial" agreement was reached as to the terms of the sale of the executor's personal property, the third party refused to consummate the deal unless agreement could also be reached as to the lease of the estate property; that such agreement was reached and both deals were closed on the same day. Have the beneficiaries demonstrated such a substantial conflict of interests on the part of the fiduciary such as, under Georgia law, to shift to him the burden of proving that the lease of the trust property was in all respects fair or that he received no personal profit from the transactions? *Erie*-directed to Georgia law, we answer in the affirmative. The District Court erred in holding that even after such a demonstration the burden remained with the beneficiaries. We reverse and remand.

Essentially, we are presented with an effort by the beneficiaries of the S. C. Tate Estate, now represented by the Fulton National Bank, to impress a constructive trust on 6,100 acres of land belonging to Steve Tate received by him in his individual capacity while he was serving as executor of the Estate.[1] On behalf of the beneficiaries, the Bank contended that Steve received this land in connection with, and as a consequence of, a breach of his fiduciary duty of undivided loyalty as executor of the Estate. In particular, the Bank alleged that Steve had simultaneously leased Estate land and sold his own land to the Georgia Marble Company which had agreed to convey 6,100 acres of its land to Steve individually if, and only if, Steve as executor would agree to the lease of Estate land. Steve did agree, and thus himself received 6,100 acres by virtue of, and partially in consideration for, his agreement as executor to Marble's lease of Estate property. According to the Bank, Marble's insistence on Steve's act as executor as a condition precedent to its conveying the 6,100 acres to Steve individually placed Steve in a position in which his personal interest substantially conflicted with the interest of the beneficiaries, and Steve's proceeding with the transactions once this conflict arose constituted a breach of his duty of undivided loyalty.

Once this far, the Bank asserted that its burden of proving or proceeding was at an end. It did not have to show that Steve was in fact disloyal, that he harmed the beneficiaries, that the transaction was in fact unfair. Nor, according to the Bank, did Steve exonerate himself by assuming the burden of proceeding to prove the contrary. For once the conflict is established, these inquiries are irrelevant. Steve must prove that he made no personal profit or, to the extent of relinquishing the entire 6,100 acres he received, account for whatever profit he made.

■ The resolution of the Bank's claim was committed by the District Court to a Special Master empowered to make findings of fact and conclusions of law. After hearing extensive evidence, the Master filed an Original Report with findings of fact and these conclusions of law:

"[1] * * * that there was no breach of trust committed by Steve C. Tate in his fiduciary capacity as executor of the estate of S. C. Tate;

"[2] * * * that while serving as executor of the S. C. Tate estate, no evidence was submitted to sustain the position claiming that Steve Tate received anything in his individual capacity as a consideration for the execution by him of a long-term lease by the estate of S. C. Tate with the Georgia Marble Company;

"[3] * * * that the Fulton National Bank as successor executor of the estate of S. C. Tate had failed to prove that it is entitled to the impression of a constructive trust upon the said 6100 acres of land, * * * of the estate of Steve C. Tate, deceased, and that no constructive trust should be impressed for the benefit of the estate of * * * [S. C. Tate]."

1. Actually, this case began as a suit against the United States and a District Director of Internal Revenue by Mrs. Lucille M. Tate, administratrix of the estate of her deceased husband, Steve Tate, alleging that jeopardy tax assessments and liens upon estate property were void and praying for the appointment of a special master with powers of a receiver to determine the amount of taxes, and the validity and priority of liens and claims against the estate. After the appointment of a special master, the United States and the District Director were dismissed from the case as parties defendant and were granted leave to intervene in order to assert their tax claims against the estate. The Appellant, Fulton National Bank, was allowed to intervene in order to assert its claim for the establishment of a constructive trust upon 6,100 acres of land belonging to the estate and received by Steve C. Tate from the Georgia Marble Company. Marble, an appellee here along with Mrs. Tate and the Government, was made a party for the purpose of answering the allegations of the intervenor Bank.

This Original Report was objected to by the Bank, particularly on the ground that the Master had erroneously placed the burden of proof upon it, and the District Court then specified four "questions of law" and thirty-four "questions of fact" and resubmitted the case to the Master for his answers.[2] The Master, without further hearing, then filed a Supplemental Report in which he found that the Bank had the burden to prove breach of Steve's fiduciary duty and that it had failed to carry its burden.[3] The District Court affirmed the Master's findings and conclusions, thus denying the relief sought by the Bank.

■ The sole question involved in this appeal is the legal one of burden of proof. The Bank contends that it has demonstrated that Steve was in a position in which his individual interest substantially conflicted with the interest of the beneficiaries of the Estate, and that once it has gone so far, the burden shifts to the fiduciary to prove that he received no individual profit in his simultaneous lease of Estate property and sale of his own property. The Appellees in defense of the fiduciary contend that the Bank made no such demonstration of a substantial conflict of interest, that even if it did, this is not enough under Georgia law to shift the burden to Steve's representative, and finally, that even if it is, and the Master and District Court erred in their ruling on the burden of proof, we must affirm since both Master and Court proceeded to hear all the evidence and found on the facts, and without regard to who had the burden of proof, that Steve had not breached his fiduciary duty. To this latter contention, the Bank counters with the well-established principle that if the trier of facts labored under such a serious legal misapprehension as to which party bore the burden of proof, its ultimate fact findings are not clothed with the insulation of Rule 52(a) and may be disregarded by the Appellate Court.

■■ We deal with this counter-contention by the Bank first, for if Appellees are correct in their assertion that the Master and District Court decided

2. Though the District Court's resubmission of the case to the Master by use of specific interrogatories is an unusual method for passing on Exceptions to a Master's Report, it turns out to have been excellent. It has the distinct advantage of informing the District Court, and now this Court, of precisely what the Master found, together with precise legal holdings on such facts.

3. The relevant questions of law posed by the Court and answered by the Master in his Supplemental Report are:

"A. Questions of Law:

"1. Which of the following paragraphs correctly states the burden of proof placed upon Intervenor Bank:

"a. To show that in negotiating simultaneously agreements with Georgia Marble Company in both a fiduciary and personal capacity, Steve Tate placed himself in a position where his personal interest might conflict with his fiduciary duty (as contended by Intervenor Bank), or

"b. To show that some benefit obtained by Steve Tate under his individual contract constituted consideration for his act as executor in entering into the new lease agreement on behalf of the Estate (as contended by plaintiff)?

"Answer: The Special Master finds that the burden of proof is correctly stated in subparagraph (b) above.

"(Stated another way these two questions became:)

"a. Must the Bank show only that Steve Tate might have been tempted to execute a lease renewal in order to obtain the agreement of Georgia Marble Company to a personal transaction (as contended by the Bank), or

"b. Must the Bank go further and show that Steve Tate obtained some concession in the negotiation of his individual contract in exchange for a concession made by him in behalf of the Estate in the contemporaneous negotiation of its new lease contract (as contended by plaintiff)?

"Answer: The Special Master finds that the burden of proof is correctly stated in subparagraph (b) above.

"2. Whatever the burden of proof which the Special Master finds Intervenor Bank must bear under question number 1, has the Bank borne this burden?

"Answer: No."

this case without regard to the burden of proof, then it would be immaterial which party had the burden. Upon an analysis of the Master's Original and Supplemental Report and the order of the District Court affirming those reports, it is apparent to us that the Master and District Judge assumed and expressly held that the burden of proof was on the Bank. Throughout the proceedings below the burden of proof was the most warmly contested issue. The conclusions of the Master in his Original Report (see p. 565 supra) were implicitly conditioned on the Bank's having the burden of proof: "[2] * * * [N]o evidence was submitted to sustain the [Bank's] position * * * [3] * * * the Fulton National Bank * * * had failed to prove * * *." In his Supplemental Report, in which he expressly held that the Bank had the burden (see note 2, supra), he said, "It has been the impression of the Special Master all during the conduct of this case that The Fulton National Bank * * * assumed the burden of proof which it was required to do * * * and that this burden of proof has remained on the Bank and was not shifted to the plaintiff in any of the proceedings before the Special Master," and his findings of fact upon which Appellees rely were premised upon his view of who bore the burden.[4] The District Judge affirmed these findings.[5]

Thus, the findings, upon which the judgment against the Bank was based, resulted from the trier's conclusion that the Bank had the burden of proof. If erroneous, this conclusion would taint the crucial findings of fact, for as we have often held, "findings induced by or resulting from, a misapprehension of controlling substantive principles lose the insulation of F.R.Civ.P. 52(a) and a judgment based thereon cannot stand." Davis v. Parkhill-Goodloe Co., 5 Cir., 1962, 302 F.2d 489, 491.[6]

Our conclusion that the Master's and District Court's view of the burden of proof was erroneous dispenses with the necessity of discussing much of the complex and conflicting evidence going to the fairness or unfairness of Steve's transactions, to the question of whether he actually breached his duty of loyalty. Rather, we dispose of this case on the basis of, and thus discuss, only those facts, as found by the Master and affirmed by the Judge, which give rise to the asserted conflict of interest.

Prior to his becoming executor of the Estate, Steve proposed to Marble that Steve and Marble personally exchange certain properties and rights. Marble, however, did not accept his proposal. On April 4, 1950, Steve became the executor of the Estate which for many years had leased extensive lands

---

4. "8. *Is there any evidence* to show that Steve Tate obtained any concessions in the negotiation of his individual contract in exchange for concessions made by him on behalf of the Estate in the contemporaneous negotiation of its new lease contract?
 "Answer: No."
 " * * *
 "10. *Is there any evidence* to show that Steve Tate received anything in his individual capacity as a consideration for his execution on behalf of the S. C. Tate estate of a new lease contract with Georgia Marble Company?
 "Answer: No."
 (Emphasis added.) These questions, asked by the Judge, were proposed by Appellees in a form as to put the burden of proof on the Bank.

5. Though his brief order of affirmance states affirmatively that "there are many circumstances tending to show that Tate as Executor was guilty of *no breach of trust,* * * *. * * * the evidence showed to the contrary," we do not think such statements convert the Master's findings of "no evidence of breach" to findings of "evidence of no breach."

6. *Accord* Fromberg, Inc. v. Thornhill, 5 Cir., 1963, 315 F.2d 407, 409; McGowan v. United States, 5 Cir., 1961, 296 F.2d 252, 254; Henderson v. Flemming, 5 Cir., 1960, 283 F.2d 882; Camilla Cotton Oil Co. v. Spencer Kellogg & Sons, 5 Cir., 1958, 257 F.2d 162; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512, cert. denied, 1959, 358 U.S. 941, 79 S. Ct. 348, 3 L.Ed.2d 349; see Malat v. Riddell, 1966, 383 U.S. 569, 86 S.Ct. 1030, 15 L.Ed.2d 154.

to Marble under a long-term mineral lease expiring in 1959. After becoming executor, Steve persisted in his proposal for a personal exchange. At the same time, in his capacity as executor, he was negotiating with Marble over the extension of the Estate lease. Though the lease was not to expire until 1959, Marble had extensive capital tied up in mining operations on the leasehold property and had set 1956 as the deadline for securing renewal of the lease. While Steve was negotiating with Marble in the dual capacity of individual and executor, he fastidiously endeavored to keep estate business and his own personal business separate, conscious that he had to change coats rather than wear Jacob's many-colored coat. Nevertheless, during this period there was considerable friction and animosity between Steve and Marble manifested in litigation, harsh words, and even shootings. Finally, in October 1954, Steve, acting in his individual capacity, reached substantial verbal agreement with Marble on terms calling for the outright exchange of Steve's own marble lands for 6,100 acres of Marble's mountainous timber lands.[7] However, Marble was unwilling to sign this agreement with Steve individually until a deal could be worked out on the renewal of the estate lease.[8] Such an agreement for renewal of the estate lease[9] was reached in February 1955, and on February 9, 1955, both the agreement between Steve individually and Marble on the exchange and the agreement between Steve as executor and Marble on the lease renewal were signed.[10] However, showing himself to be far from oblivious to the delicate and conflicting position he was in, Steve insisted that the agreement with him individually be back-dated to October 26, 1954, the time when he felt he and Marble had reached substantial verbal agreement over the terms of his individual deal.[11] All the beneficiaries of the Estate

7. Actually this exchange included various other property rights on both sides. And much of the controversy before the Master was over the values of the exchanged rights, the Master finding that Marble considered the exchange a quid pro quo, that Steve receded from substantial demands made in his 1950 proposal, that Marble greatly desired Steve's land to eliminate the threat of a competitor who desired to move into the area, etc. But in the view we take of this case, these controversies and the Master's resolution of them are immaterial. We thus sketch the facts in skeletal form, omitting many details unnecessary to the resolution of this appeal.

8. The Master's Original Report summarizes the testimony which he credited of several Marble officials revealing its position:

"It was the position of * * * Marble * * * that they didn't want to settle one of the things without the other, they wanted to get the whole war over with. Steve was fighting them individually and as executor. * * * [T]he Marble Company was not willing to sign the agreement with Steve individually unless they could also renew the lease with the S. C. Tate estate. * * * They [Marble] would not have signed the agreement with Steve [over his individual property] if they were having to move out and leave the community [by virtue of the expiration of the lease]."

9. Again, as was the case with Steve's individual agreement (note 7, supra), the Appellees emphasize the evidence and the Master's findings on the advantages of this lease, as compared with the old one, to the estate. But again, our disposition of the case makes this consideration irrelevant.

10. From the Master's Supplemental Report:

"1. When did Steve Tate enter into the two agreements with Georgia Marble Company, one in his individual capacity and one as executor?

"Answer: The individual agreement dated October 26, 1954, apparently was signed on or about the same day as the agreement reached as executor which was dated February 9, 1955."

11. From the Master's Supplemental Report:

"2. At whose insistence was his personal agreement back-dated?

"Answer: The agreement with Steve Tate, individually, was reached sometime in the fall of 1954, whereas the other agreement was not reached until January or February, 1955, but Steve wanted the contract with himself, individually, dated as of the approximate time when the agreement was reached. Steve's lawyer, also thought it should

signed the lease renewal negotiated by Steve and subsequently received substantial benefits therefrom, but the Master found that at least one of the beneficiaries was unaware of the existence of Steve's personal agreement.[12]

This brings us to the following pivotal fact findings by the Master:

"4. Would Georgia Marble Company have executed the personal agreement with Steve Tate without securing Steve Tate's agreement to a lease renewal satisfactory to Georgia Marble Company?

"Answer: Georgia Marble Company did not want to sign an agreement with Steve, individually, if he was going to keep on fighting them as Executor.

"5. Was Steve Tate aware of the answer to question 4?

"Answer: Yes

"* * *

"8. Had no lease renewal been before the parties, would Georgia Marble Company have executed the personal agreement in 1955?

"Answer: Apparently not."

In other words, Steve and Marble reached agreement on the personal exchange first, but Marble refused to sign unless Steve would renew the estate lease.[13]

■ The question here is whether once the Bank has shown this circumstance, the burden shifts to the fiduciary to prove that Steve made no personal profit by use of the Estate's property. This question is not simple for a number of reasons. First, general rules on the fiduciary's duty of undivided loyalty are necessarily general and offer limited help in resolving a concrete problem in this area. The general and elusive nature of the rules is demonstrated by the fact that both the Bank and the Appel-

---

be dated at the time a substantial understanding was reached.

"3. What light does the Record throw on the reason why it was backdated?

"Answer: Negotiations had been going on for a period of several years and finally, in the summer of 1954, Steve Tate indicated that he wanted to reach an agreement and the date of the agreement with Steve, individually, was approximately October 26, 1954. At the same time, negotiations for the renewal of the lease with the S. C. Tate Estate were going on and an agreement was reached on approximately February 9, 1955, as to the lease with the S. C. Tate Estate, of which Steve Tate was the Executor. Both the agreement and the lease was executed at approximately the same time. Georgia Marble Company did not desire to settle one of these issues without the other. Steve Tate recognized his dual capacity, that is, his individual interest and his duties as Executor, and these were kept separate. Steve wanted the dates on the two instruments kept separate. He felt that the deal with himself, individually, had been arranged in advance of the lease and he wanted the agreements to reflect that fact."

12. Supplemental Report:
"24. Was Sam Tate, a beneficiary, informed of the existence of the personal agreement prior to execution of the lease renewal?
"Answer: No."
Though in some circumstances *all* the beneficiaries might ratify their trustee's breach of the duty of loyalty, the law is quite clear, in Georgia as elsewhere, that there can be no ratification unless the beneficiaries are informed of the facts giving rise to the trustee's conflict of interest. See 54 Am.Jur. Trusts § 333; Annot., 29 A.L.R.2d 1036. And even if the Master had found that all of the beneficiaries knew of the existence of Steve's personal deal, they would also have to be informed of Marble's conditioning agreement thereto upon renewal of the estate lease before there could be an effective ratification.

13. In affirming that Master's findings, the District Judge said, "It appears that he [Steve] could not have closed this particular renewal in behalf of the estate without at the same time settling an individual controversy which he had with Georgia Marble Company involving the proposed sale of 6100 acres of land." But neither the evidence nor the Master's findings indicate that the lease renewal was conditioned on the personal exchange, that Marble would not agree to the lease renewal without Steve's agreeing to the individual deal. Instead, the personal exchange was conditioned on the lease renewal and not vice versa.

lees consider the cases of Arthur v. Georgia Cotton Co., 1918, 22 Ga.App. 431, 96 S.E. 232, and Phelan v. Middle States Oil Corp., 2 Cir., 1955, 220 F.2d 593, cert. denied, Cohen v. Glass, 349 U.S. 929, 75 S.Ct. 772, 99 L.Ed. 1260, controlling on this question. Second, and perhaps manifested in the generality of the general rules, is the fact that there are two opposing policy considerations in this area which must be weighed in the individualistic scales of each concrete situation. On the one hand, there is the first commandment of fiduciary relations: thou shalt exalt thy beneficiary above all others. As expounded in the oft-quoted words of Judge Cardozo:

> "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

Meinhard v. Salmon, 1928, 249 N.Y. 458, 164 N.E. 545, 546, 62 A.L.R. 1. On the other hand, and from Judge Hand, there is the caveat that "the law ought not make trusteeship so hazardous that responsible individuals * * * will shy away from it. * * * 'the courts should not impose impractical obligations on a trustee. Merely vague or remote possible selfish advantages to a trustee are not sufficient to prove such an adverse interest as to bring his conduct into question.'" Dabney v. Chase Nat. Bank, 2 Cir., 1952, 196 F.2d 668, 675.

With these problems in mind, we deem it appropriate to discuss the general principles governing the fiduciary's duty of loyalty.

The general rule is that "the trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." Restatement (Second), Trusts § 170 (1959). He violates his duty "not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of *such a substantial nature* that it might affect his judgment in making the sale," id. comment *c* (emphasis added), and "also. where he uses the trust property for his own purposes," id. comment *l*. Furthermore, "the trustee violates his duty * * if he accepts for himself from a third person any bonus or commission for any act done by him *in connection with the administration of the trust*." Id. comment *o*. (Emphasis added.) If the trustee violates his duty of undivided loyalty, he is liable to the beneficiary for any profit thereby made. Thus, "if the trustee * * * uses trust property for his own purposes and makes a profit thereby, he is accountable for the profit so made," id. § 206 comment *j*, and if he "receives for himself from a third person any bonus or commission or other compensation for acts done by him *in connection with the administration of the trust*, he is accountable for the amount so received," id. comment *k* (emphasis added). And even though he does not breach his trust, "the trustee is accountable for any profit made by him *through or arising out of the administration of the trust*. Id. § 203 (emphasis added).[14] However, "if the trustee enters

---

**14.** "Even if he enters into the transaction without intending to make a profit for himself and commits no breach of trust in so doing, nevertheless he is not permitted to retain the profit. Thus, if the trustee receives a commission or bonus for acts done in connection with the administration of the trust, he is accountable therefor, even if he does not commit a breach of trust in receiving the commission or bonus." Restatement (Second), Trusts § 203, comment *a* (1959).

into a transaction *not connected with the administration of the trust,* he is not accountable for a profit which may result merely because the trust property is *indirectly* affected thereby." Id. comment *e*. (Emphasis added.)

Although "the duties of a trustee are more intensive than the duties of some other fiduciaries," id. § 2, comment *b*,[15] the same general rules are applicable to other fiduciaries.[16]

This is where the law draws on behavioral psychology, where the rules of fair dealing required by equity coincide with human experience. The rules of undivided loyalty have developed as defensive responses of the common-law nervous system to impulses of self-interest. The rationale of these well-settled principles of undivided loyalty is clear:

"[I]t is generally, if not always, humanly impossible for the same person to act fairly in two capacities and on behalf of two interests in the same transaction. Consciously or unconsciously he will favor one side as against the other, where there is or *may be* a conflict of interest. If one of the interests involved is that of the trustee personally, selfishness is apt to lead him to give himself an advantage. If permitted to represent antagonistic interests the trustee is placed under temptation and is apt in many cases to yield to the natural prompting to give himself the benefit of all doubts, or to make decisions which favor the third person who is competing with the beneficiary."

Bogert, Trusts and Trustees § 543, at 475–76 (2d ed. 1960) (Emphasis added). See also 2 Scott, Trusts § 170 (2d ed. 1956); 4 id. § 502, at 3235–36; 54 Am. Jur. Trusts § 311–315 (1945). And in accord with this rationale, the beneficiary need only show that the fiduciary allowed himself to be placed in a position where his personal interest *might* conflict with the interest of the beneficiary. It is unnecessary to show that the fiduciary succumbed to this temptation, that he acted in bad faith, that he gained an advantage, fair or unfair, that the beneficiary was harmed. Indeed, the law presumes that the fiduciary acted disloyally, and inquiry into such matters is foreclosed. The rule is not intended to compensate the beneficiary for any loss

---

15. 2 Scott, Trusts § 170, at 1193:
"In some relationships the fiduciary element is more intense than in others; it is peculiarly intense in the case of a trust. It is the duty of a trustee to administer the trust solely in the interest of the beneficiaries. He is not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiaries."
*Accord*, Lowery v. Idelson, 1903, 117 Ga. 778, 45 S.E. 51, 52.

16. Restatement (Second), Agency § 388, comment *a* (1958):
"* * * [T]he agent's * * * duty to account includes accounting for any unexpected and incidental accretions whether or not received in violation of duty. Thus, an agent who, without the knowledge of the principal, receives something in connection with, or because of, a transaction conducted for the principal, has a duty to pay this to the principal even though otherwise he has acted with perfect fairness to the principal and violates no duty of loyalty in receiving the amount."
Restatement, Restitution § 197 (1937):
"Where a fiduciary in violation of his duty to the beneficiary receives or retains a bonus or commission or other profit, he holds what he receives upon a constructive trust for the beneficiary.
"*Comment:*
"*a.* * * * the rule stated in this Section is applicable * * * also where something is given to him and received by him in good faith, if it was received for an act done by him in connection with the performance of his duties as fiduciary. * * *
"* * * *
"*c.* * * * The rule stated in this Section is applicable although the profit received by the fiduciary is not at the expense of the beneficiary. * * * [It] is not based on harm done to the beneficiary in the particular case, but rests upon a broad principle of preventing a conflict of opposing interests in the minds of fiduciaries, whose duty it is to act solely for the benefit of their beneficiaries."

he may have sustained or to deprive the fiduciary of any unjust enrichment. Its sole purpose and effect is prophylactic: the fiduciary is punished for allowing himself to be placed in a position of conflicting interests in order to discourage such conduct in the future. Though equity protects the beneficiary with a gentle wand, it polices the fiduciary with a big stick. The trustee must avoid being placed in such a position, and if he cannot avoid it, he may resign, or fully inform the beneficiaries of the conflict, or, upon so informing the court, request approval of his actions. Otherwise, he proceeds at his peril.

A brief review of the Georgia cases reveals that Georgia follows these general principles.[17] Lowery v. Idelson, 1903, 117 Ga. 778, 45 S.E. 51, involves a sale of estate property by an administratrix to her husband at a public auction. Though the husband paid a fair price and the purchase was free from fraud or collusion, the Court set it aside, saying:

> "An administrator or executor is a trustee invested with a solemn trust to manage the estate under his control to the best advantage of those interested in it; and if he undertakes to sell the property of the estate it is his bounden duty to do everything in his power to make it bring as large a price as possible. Nothing can be tolerated which comes into conflict or competition with the interests and welfare of those interested in the estate."

45 S.E. at 52. In Haley v. Atlantic Nat'l Fire Ins. Co., 1921, 151 Ga. 158, 106 S.E. 122, the executrix of an estate individually purchased foreclosure judgments against estate land and sought reimbursement from the estate. Though there was no showing that the estate had any funds with which to purchase the judgments and though it had no enforceable right of redemption, the Court denied reimbursement on the ground that "she put herself as an individual in a position that was in conflict with the proper discharge of her duties as executrix." 106 S.E. at 124. The Court went on to note:

> "We do not assert that Mrs. Haley [the executrix] acted in bad faith. Under the authorities, the question of good faith * * * is immaterial. It may be that the purchase by Mrs. Haley was in fact advantageous to the estate. This argument has been often advanced, and as often rejected. The broad rule of equity, applicable alike to agents, partners, guardians, executors, * * * is that it is the duty of a trustee not to accept any position or to enter into any relation or to do any act inconsistent with the interest of the beneficiary."

Ibid. Perhaps, the most eloquent statement of Georgia law comes from Clark v. Clark, 1928, 167 Ga. 1, 144 S.E. 787, where the Court approved the removal of a trustee who had become an officer of a corporation whose shares were held in trust:

> "It is a fundamental rule that a trustee can make no profit for himself out of the trust estate. This principle is so essential to the honest and proper management of trust property that the trustee is never encouraged to take risks with it for his own aggrandizement. * * * The current of Georgia policy, both legislative and judicial, runs steadily in one direction and to one point—that is, that no trustee shall have the opportunity or be led into the temptation to make profit out of the business of beneficiaries entrusted to his care, by bargaining with himself, directly or *indirectly*, in respect to that business. * * * Trustees can never be allowed to derive a personal advantage from the use of the trust property. * * * They cannot make a personal profit in dealing with trust property. * * * A testamentary trustee must act, not only for the benefit of the trust estate,

---

17. Ga.Code Ann. § 108-429 provides: "The trustee shall not use the trust funds to his own profit. He shall be liable to account for all such profits made."

but also in such a way as not to gain any advantage, directly or *indirectly,* * * * and he owes an undivided duty to the beneficiary, and must not place himself in a position where his personal interest will conflict with the interest of the beneficiary. * * * [T]he trustee owes an undivided duty to the beneficiary under the trust, and cannot place himself in a position which would subject him to conflicting duties or expose him to the temptation of acting contrary to the best interests of the cestui que trustent. * * * Beneficiaries of a trust are entitled to have it administered by trustees entirely at the service of the trust and above suspicion. * * * The purpose of this rule is to require a trustee to maintain a position where his every act is above suspicion * * *. Whenever he * * * has placed himself in a position that his personal interest has *or may* come in conflict with his duties as trustee, * * * a court of equity never hesitates to remove him. In such circumstances the court does not stop to inquire whether the transactions complained of were fair or unfair; the inquiry stops when such relation is disclosed."

144 S.E. at 789. (Emphasis added.) Accord, Fine v. Saul, 1936, 183 Ga. 309, 188 S.E. 439.

These Georgia decisions directly support the Bank's position. In the words of the *Clark* case, were Steve's actions "above suspicion"? In his order affirming the Master's reports, the District Judge recognized that the "two transac-

tions might on their face have been sufficient to arouse the suspicions of certain heirs to the estate." Had Steve "placed himself in a position that his personal interest * * * may come in conflict with his duties as trustee"? Again the District Judge noted: "There could have been, of course, a conflict of interests * * *." The simple fact is that once Marble refused to agree to Steve's personal deal unless and until Steve as executor agreed to the Estate's lease renewal, Steve had a considerable personal interest in the renewal of the lease and upon such terms as would be acceptable to Marble. Perhaps it was in the Estate's best interest to have the lease renewed. Perhaps Steve got all that anyone could have gotten for the Estate at that stage. These things are simply not pertinent under Georgia law: "the inquiry stops when such * * * [conflict of interest] is disclosed." Clark v. Clark, supra.

To this view of Georgia law Appellees pose two objections.

 First, they argue that if Steve did make a profit on his personal deal, this transaction was not connected with the administration of the trust and only indirectly affected the trust property. Restatement (Second), Trusts § 203, comment *e*, supra.[18] To be sure, the general principles outlined above, see notes 14–16, supra, and accompanying test, are only brought into play if there is some connection between the transaction in which the fiduciary personally engaged and the administration of his trust or the scope of his agency. But here Appellees admit, as they must, "a nexus be-

---

18. Appellees rely on the statement by the District Judge that "the Special Master was authorized to find that the trust property was in fact * * * [at most only] 'indirectly affected' by the present [personal] transaction of Tate with Georgia Marble Company * * *." We agree with the Bank that the Master made no such finding, and that even if he did, it would be immaterial. The relied on section of the *Restatement* allows the trustee to retain profits he made in personal transactions which only indirectly affect the trust estate if, and only if, there is no connection between the

trustee's personal dealing and his administration of the trust estate. This big "if" emphasizes the *connection* between the trustee's personal transaction and the administration of the trust, not the *effect in fact* which the transaction has upon the trust property. If there is a connection and a conflict, then effect in fact—good, bad, indifferent, direct, indirect, neutral—is irrelevant. For once a conflict of interest is shown, the fiduciary is liable for any profit made by him "through or arising out of the administration of the trust." Id. § 203.

tween the contracts arising out of the fact that the fiduciary's assent to the contract negotiated in his representative capacity constituted a condition precedent to the contract being negotiated with the fiduciary in his individual capacity," [19] and thus § 203, comment e, is inapplicable.[20]

Appellees' second objection is that under the law of Georgia before the Bank can shift the burden of proof to them, it must show not only that Steve had conflicting interests, but that the conflict was "substantial," and that a different standard of substantiality applies in cases where the trustee is contemporaneously negotiating a personal and a trust contract with a third party vis-a-vis cases where the trustee is dealing directly with the estate in his individual capacity. They assert that all the Georgia cases discussed above are of the latter type, and that Arthur v. Georgia Cotton Co., supra, being the only Georgia case of the former variety, points in a different direction. Although we are willing to accept the requirement of a "substantial" conflict as enunciated in Restatement (Second), Trusts § 170 comment c, supra, and in Phelan v. Middle States Oil Corp., supra, we fail to perceive that the Georgia cases in applying this requirement draw the distinction for which Appellees contend. And even if Arthur requires something more in this situation than the other cases discussed above, we hold that that "something more" is present here.

This brings us to Arthur. The Georgia Cotton Company sued Arthur for failing to perform his contract to deliver 100 bales of cotton. Arthur confessed nonperformance and set up in avoidance that the contract of sale was void. According to Arthur, his agent Champion,

a cotton broker, had agreed to sell the cotton for 12 cents a pound or more, informed him that he could only get 12 cents, then sold to Georgia Cotton for 12⅛ cents, the undisclosed ⅛ cents going to Champion in consideration for his agreement to guarantee performance by Arthur. At the trial Georgia Cotton introduced no proof, but the jury found for it. The Georgia Court of Appeals affirmed. The Court first set out the general principles in accord with the above cases:

"The first duty of an agent is that of loyalty to his trust. He must not put himself in relations which are antagonistic to that of his principal. His duty and interest must not be allowed to conflict. He cannot deal in the business within the scope of his agency for his own benefit * * * nor is he permitted to compromise himself by attempting to serve two masters having a contrary interest * * *. It is immaterial in such a case that fraud by the agent was not actually intended, or that no injury was in fact occasioned to the principal. These rules of law are not merely remedial for actual wrongs which have been consummated, but are intended to be preventative as well. * * * The question is not whether such a payment [secret commission] to the confidential agent resulted in actual harm to the principal, or whether it was the actual inducement which brought the parties into agreement; but the question is whether or not such a secret payment could be taken as a consideration for any act on the agent's part within the scope of his agency— whether such a payment or promise of payment might make it the personal interest of the agent so to agree."

19. Brief of Mrs. Lucille M. Tate on behalf of Steve Tate, p. 15.

20. This is made clear by the illustration following comment e:

"2. A devises his family residence to B in trust to permit C, * * * to reside therein during her lifetime and at her death to convey the property to D. By the terms of the trust B is not au-

thorized to purchase land. During C's lifetime B learns that negotiations are pending for the sale of adjoining land for uses of an objectionable nature. To prevent this, B with his own funds purchases the adjoining land for $10,-000, and after holding it for five years he sells it for $25,000. B is not accountable for the profit."

96 S.E. at 232–233. (Emphasis added.) Then, without indicating that this case is to be governed by a different rule, the Court holds:

> "In this case the jury found under the undisputed evidence that *the sole consideration* of the undisclosed promise of the buyer to the agent of the seller *was the guaranty* by the latter of his principal's contract. Since such an agreement lay wholly *beyond the scope of the agency,* it cannot be said as a matter of law that the interest of the agent in negotiating the terms of sale could have been affected thereby."

96 S.E. at 233. (Emphasis added.)

Though some might assert that application of these principles to the facts of the case should have led the Georgia Court of Appeals to the opposite result, there can be no doubt as to what the Court conceived, and stated, the law to be. First, the Court did not expressly or impliedly indicate that the standard of substantiality of conflicting interests is different in the case of the fiduciary's negotiation of contemporaneous contracts with a third party from that to be applied when the fiduciary is dealing directly with the trust. The Court undertook to apply the general rule. Second, the Court stated the relevant inquiry as being "whether or not * * * [any benefit received from the third party] could be taken as a consideration for any act on the agent's part within the scope of his agency," and concluded that (1) the guaranty agreement was wholly beyond the scope of the agency to sell cotton [21] and (2) the jury found that the sole consideration received by Georgia Cotton for the ⅛ cents paid to Champion was the latter's guaranty of his principal's contract.

Superimposing the Georgia Court of Appeals' language on the facts of this case, the inquiry here is "whether or not Steve received anything from Marble which could be taken as a consideration for any act on his part connected with his administration of the Estate?" First, it cannot be said that Steve's personal transaction with Marble was wholly unconnected with his administration of the Estate. As individual and executor, Steve fought with Marble; Steve, as individual and executor, negotiated with the same officials of Marble at the same time over the same kind of property; as individual and executor, Steve closed both deals at the same time. And Marble wanted Steve's marble rights only if it could retain its mining facilities on the Estate lease. It was tit for tat down to the wire.[22] Second, it cannot be said that Steve received nothing from Marble for his renewal of the Estate lease. He received Marble's acquiescence to the personal exchange, for it is clear that at least one of the reasons Marble agreed to convey 6,100 acres to Steve was Steve's agreeing as executor to renew the lease.[23]

Thus, viewing *Arthur's* light in the panorama of Georgia Supreme Court decisions—both before (Lowery v. Idelson, supra) and after (Clark v. Clark,

---

21. Restatement (Second), Agency § 391, comment *b*, provides that "an agent can properly deal with the other party to a transaction if such dealing is not inconsistent with his duties to the principal. Thus, an agent employed to sell can properly lend money to the buyer to complete the purchase * * *." See 12 Am.Jur.2d Brokers § 87, at 841 n. 4, and cases there cited.

22. We do not attempt to distinguish this case from *Arthur* on the ground that the fiduciary there was an agent and Georgia, in accord with the general rule, holds executor-trustee to a higher standard of loyalty than agents. See note 15,
supra. But it is true that the fiduciary in *Arthur* was a special agent with limited scope of authority and that it would not be too difficult to find that his personal guaranty was outside the scope of his agency. A different case is presented with our fiduciary here, an executor with broad powers of transaction.

23. It is important to note that the *Arthur* inquiry is whether the fiduciary received anything "which *could be taken* as *a* consideration * * *," rather than whether he received anything which *was the* consideration. Again the emphasis is on the possibility rather than the actuality of disloyalty.

supra)—on the bright *Erie*-horizon,[24] and using it for illumination of the facts of this case, we find that it is no beacon of help to Appellees. Rather it supports the Bank's position and our holding.

Likewise, the Appellees do not get much mileage from Phelan v. Middle States Oil Corp., 2 Cir., 1955, 220 F.2d 593, cert. denied, 349 U.S. 920, 75 S.Ct. 772, 99 L.Ed. 1260.[25] Judge Hand's opinion merely states the accepted general rule and illustrates the necessity for a careful evaluation in each case of the facts giving rise to the asserted conflict. The case was a corporate receivership proceeding in which bondholders objected to the receivers' final account *inter alia* on the ground that the receiver, Glass, violated his duty of loyalty by following conflicting interests. The Court first recognized the general rule:

> "However, although we put aside, as we do, the charge that Glass was a party to any fraud or conspiracy, we agree with the 'Bondholders' that the burden would nevertheless be upon him to prove that they had suffered no actionable loss by any of his acts or decisions in which he *could have been actuated by a personal interest*

*that conflicted with his duty to them.* Moreover, in that event it would not relieve him of the burden even to prove, if he could, that his putative interest did not in fact influence him, for the law will not attempt to weigh how far such an interest may have played a part in the result, once it be shown to have existed. * * * Nevertheless, before the burden of proof shifts, the beneficiary must prove that there was such a conflict * * *."

220 F.2d at 600. (Emphasis added.) The Court then examined the asserted conflicts. The first was that Glass hoped to become president of the reorganized corporation. Previously, the Court had held that if this were true it would be such a conflict as to shift the burden to Glass, see note 25, supra, but upon remand the trial Court found that Glass had no desire to be president. The Court of Appeals affirmed this finding. Another asserted conflict was that Glass hoped to be chosen counsel of the new corporation. The Court, however, held that the personal interest Glass had in being retained as counsel of the new company was not substantial enough[26] to trigger the conflict-of-interest rule.[27]

---

24. Our *Erie*-commission is to refract these rays with a wide-angle lens, then focus into a composite picture, not a spectrograph. We thus refine only to meld.

25. For a prior appeal in this extended litigation, see Phelan v. Middle States Oil Corp., 2 Cir., 1946, 154 F.2d 978.

26. Judge Hand asked:
"Was that such a conflict as invokes the doctrine? It enables the beneficiary to hold the fiduciary liable for any profits he may make, or losses he may cause, in order to deprive him of any inducement that will affect his absolute and disinterested loyalty; and there is no doubt that an expectation or hope of future advantage may do so, even though it is not secured to him as an existing legally protected interest. Therefore, if the doctrine be inexorably applied and without regard to the particular circumstances of the situation, every transaction will be condemned once it be shown that the fiduciary had such a hope or expectation, however unlikely to be realized it may be, and however trifling an inducement it will be, if it is realized. We do not understand that it is to be applied so rigidly, or to so literal an extreme. The Restatement of Trusts [§ 170, Comment (c)] states it in these words: the 'trustee violates his duty to the beneficiary not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale.' And this has been incorporated in ipsissimis verbis into Scott on Trusts. That statement we accept, and the question at bar is whether Glass's expectation of being counsel was an interest so 'substantial * * * that it might affect' his promoting as much as he should have done, the sale of the Eureka shares in place of including them in the reorganization of 'M.S.O.' It is true we cannot know that the chance of employment could not have had any influence upon his conduct; and it is of course true that, if the 'Bondholders' had shown

Our holding here harmonizes with *Phelan*. The possibility was substantial that Steve received significant concessions from Marble on his personal exchange—although he did part with some of his personal property [28]—as a consequence of his agreement to renew the estate lease. This danger is neither too remote nor too trifling.

As a last resort, the Appellees argue that from a standpoint of policy our conclusion has a "hazardous implication." [29] According to Appellees, "the inexorable consequence would be that in any instance in which the bank [as trustee] purchased or sold any security through the same broker for the account of any trust and contemporaneously therewith negotiated the purchase or sale of any security through the same broker for its personal portfolio, the bank would thereby open itself to surcharge in the

---

that in fact it did have any, he would not only have to disgorge any profits he had got, but to prove that what he did was an impeccable discharge of his full duty, or to make good any loss that it caused. But we are not dealing with such an occasion; we have to determine the scope of the implementary rule that dispenses with the need of proving that his personal interest had any part in determining the fiduciary's conduct; indeed, with a rule that altogether forbids any inquiry whether it had any such part. We have found no decisions that have applied this rule inflexibly to every occasion in which the fiduciary has been shown to have had a personal interest that might in fact have conflicted with his loyalty. On the contrary in a number of situations courts have held that the rule does not apply, not only when the putative interest, though in itself strong enough to be an inducement, was *too remote*, but also when, though not too remote, it was *too feeble* an inducement to be a determining motive."
220 F.2d at 602–603. (Emphasis added.)

27. This holding was based on several considerations: (1) although Glass was reasonably sure to be retained, he had no contract and his employment depended on what the administration of the new company might decide; (2) the hope for advantage was obtainable only by means of a *quid pro quo*, services to be rendered, which diminished its inducement; (3) the policy that it is "most undesirable * * * to forbid a purchaser of property from a fiduciary to continue him in its management" and the interest of the purchaser to keep the fiduciary with the possibility that this will greatly enhance the value of the property. 220 F.2d at 604.

28. Much of the controversy before the Master was over the respective values of Steve's personal property and the 6,100 acres belonging to Marble. See note 7, supra. One executive of Marble thought that the 6,100 acres was not good for anything but goat pasture, though he never knew of anyone placing a dollar value on it. Another Marble official had no idea whether it was worth $1 or $100,000. Marble also disclaimed knowing what the marble rights received from Steve personally were worth, since only after mining the property could the rights be valued. Other than finding that *Marble* considered the personal exchange a quid pro quo, the Master made no attempt to resolve these conflicting estimates of value. Although it requires more naivete than we have to believe that Marble was so ill-informed as to matters so vital to its business, nevertheless, all this uncertainty as to the value of the exchanged rights—at least from the vantage point of those not in the marble business, including the beneficiaries—is tangible proof of the practical wisdom of the rule which surcharges the fiduciary for whatever personal profit he makes in connection with his administration of the estate regardless of whether it is a fair profit. The greater the uncertainty of values, then the greater the difficulty later—often many years so—for the beneficiaries to prove any unfairness or actual disloyalty, and accordingly, the greater the temptation to the fiduciary to secure some personal advantage at the expense of the estate. The law justly places this valuation problem on the party who caused it, the fiduciary.

29. See Dabney v. Chase Nat'l Bank, 2 Cir., 1952, 196 F.2d 668, 675:
"It is not every possibility, however remote, of a conflict of interest between a trustee and his beneficiary which will forbid his entering into a transaction with a third person. * * * The law ought not make trusteeship so hazardous that responsible individuals and corporations will shy away from it."

amount of such profit as it realized on its personal transaction."[30] This fear is simply unfounded—unfounded unless there is a connection between the fiduciary transaction and the personal one, and if there is a connection, there is and should be the fear of being brought to book.[31]

 It should now be clear that on remand of this case the burden of proceeding is on the Appellees. Furthermore, they have the burden of proving that Steve made no profit on his personal exchange, or failing in this effort, they must account for whatever profit he made. Even without regard to his misconception of who had the burden of proof, the Master simply never reached the issue of how much profit, if any, Steve realized on his personal deal.[32]

The Master simply determined that the transaction was fair, that Steve did not obtain any concessions on his individual contract in exchange for concessions made by him on behalf of the Estate, that he did not receive anything in consideration for his renewal of the Estate lease. But all these inquiries were and remain irrelevant. The principal things to be determined on remand in light of the principles we have announced are: (1) whether Steve realized any profit on his personal exchange, (2) if so, how much profit did he realize,[33] and (3) in that case, what relief is to be granted the Bank. Since we have for the first time in this litigation declared the appropriate legal standards, on remand all parties should have the opportunity to present whatever factual information is pertinent as to these issues.[34] See, e. g., Hill

---

30. Brief of Mrs. Lucille M. Tate on behalf of Steve Tate, pp. 14–15.

31. Suppose, for example, the Bank holds unlisted over-the-counter stock in its own portfolio which has an unsteady, weak market with no willing buyers (bids). At the same time, as a fiduciary, it holds unlisted over-the-counter stock for which there is a brisk demand (bids). If the Bank, as a condition to selling the attractive fiduciary stock demands that the prospective purchaser (or broker) buy the unattractive stock, its conduct is surely duplicitous entailing all of equity's burdens.

32. This is clear from the Master's Supplemental Report:
"6. In order to sustain any finding that Steve Tate realized a personal profit on his individual contract, must there be evidence showing that as regards that contract the reasonable market value of the consideration which he gave was less than the reasonable market value of the consideration which he received?
"Answer: *This question was not considered* by the Special Master in making his Report as the decision of the Special Master was to the effect that the Bank had not carried the burden of proof as set forth in the pleadings.
"7. If the answer to question number 6 is yes, is there any evidence to show the market value of the consideration which Steve Tate conveyed to Georgia Marble Company under the terms of this individual contract?

"Answer: This question is covered in the answer to number 6 above."
(Emphasis added.)

33. By "profit" is meant the extent to which the reasonable market value, at the time of the exchange, of the property Steve individually received from Marble exceeded the reasonable market value, at the time of the exchange, of the personal rights Steve conveyed to Marble. See note 32, supra. Steve must account for that difference irrespective of whether it was a concession given to Steve by Marble in consideration of his fiduciary action. In other words, if Steve received more than the reasonable market value of his personal rights, Steve cannot avoid accounting for this profit by showing that it was attributable to peculiar factors other than his agreement to the estate lease renewal.

34. For example, if it appears on remand that some or all of the beneficiaries, other than Sam Tate (see note 12, supra, and accompanying text), signed the lease renewal and accepted the benefits flowing therefrom with full knowledge of Marble's conditioning its acceptance of Steve's personal deal on Steve's acquiescence in the renewal, then the Court below will have to consider whether those beneficiaries are foreclosed from objecting to the transactions and whether Steve's obligation to account for personal profit, if he made any, is correspondingly limited. The present record is clearly insufficient on these matters.

v. FPC, 5 Cir., 1964, 335 F.2d 355. The trial Court will have considerable discretion in the method it chooses to handle and resolve these questions, including, among other things, whether further hearings are to be held before the Master, Court, or both. For quite obvious reasons full use and advantage should be made of the present record of the proceedings before the Special Master.

Reversed and remanded.

COLEMAN, Circuit Judge (specially concurring):

As indicated at the time of oral argument, the decision of this case has given me much concern. We have been forced to travel over some legal highways which I feel have not clearly been mapped by the Georgia Courts of last resort. In any event, I do agree that further hearing is in order, and I concur in the opinion, but I would hope that the Court or Master, as the case may be, will be extraordinarily careful thoroughly to understand the standards herein discussed and the directions herein given before undertaking any further exploration of the facts.