ESTATE OF JOHN G. BOYKIN, DECEASED, AMSOUTH BANK N.A. AND HARLENE B. BOYKIN, CO-EXECUTORS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Boykin v. Commissioner
Docket No. 38554-84.
United States Tax Court
T.C. Memo 1987-134; 1987 Tax Ct. Memo LEXIS 130; 53 T.C.M. (CCH) 345; T.C.M. (RIA) 87134; March 12, 1987. David M. Wooldridge and Harold Apolinsky, for the petitioners. John B. Harper and Helen C. T. Smith, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION "KORNER, Judge: In his notice of deficiency respondent determined a deficiency of $5,496,674 in the Federal estate tax of the Estate of John G. Boykin. After a severance of other issues to be decided following a separate trial, the sole issue presented here for decision is whether decedent John G. Boykin retained either a right to income from, or the enjoyment of, voting stock that he transferred to a family trust for the benefit of his children such that the *131 value of the stock is includable in his gross estate under section 2036(a)(1). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner is the Estate of John G. Boykin. John G. Boykin (the "decedent") was a resident of Mobile, Alabama, when he died on June 26, 1980. This case involves stock of Tensaw Land & Timber Company, Inc. ("Tensaw") that the decedent transferred to a trust for the benefit of his children. Tensaw is an Alabama corporation that was incorporated on November 6, 1937. Tensaw merged with Washington Lumber & Turpentine Company, Inc., another Alabama corporation, on or about March 21, 1960. After the merger the principal owner of Tensaw was decedent's father, Frank W. Boykin. Since 1960, Tensaw's operations have included the following: (1) acquiring, holding, leasing, and disposing of various forms of real property and interests *132 therein; (2) leasing and conveying oil, gas, and mineral interests on properties owned by it; (3) producing oil and gas; and (4) investing in subsidiary corporations, stocks, and bonds. Frank W. Boykin died in early 1969. At the time of his death Tensaw had only one class of stock, voting common ("voting stock"). Forty thousand shares of the voting stock were issued and outstanding. [2] On October 6, 1969, the 40,000 shares were owned by Frank W. Boykin's widow and children as follows: Stockholder
Voting Shares
Ocllo G. Boykin (widow)
3,500
Estate of Frank. W. Boykin
8,500
Frances Boykin Smith
7,000
James R. Boykin
7,000
Richard A. Boykin
7,000
Decedent
7,000
On October 6, 1969, Tensaw's articles of incorporation granted the owners of the 40,000 shares of voting stock the sole rights to receive any dividends paid by the corporation, if and when declared. On October 7, 1969, Tensaw amended its articles of incorporation. The amendment canceled the board's authority to issue additional shares of voting stock and authorized the board to issue 150,000 shares of nonvoting *133 stock ("nonvoting stock"). Contemporaneously with the adoption of the amended articles, Tensaw issued to the owners of the voting stock 3.75 shares of the nonvoting stock for each share of voting stock. Tensaw's stock was owned as follows following the amendment to its articles of incorporation: Stockholder
Voting Stock
Nonvoting Stock
Ocllo G. Boykin (widow)
3,500
13,125
Estate of Frank. W. Boykin
8,500
31,875
Frances Boykin Smith
7,000
26,250
James R. Boykin
7,000
26,250
Richard A. Boykin
7,000
26,250
Decedent
7,000
26,250
Total Shares
40,000 150,000 Tensaw's amended articles of incorporation granted the nonvoting shares a preference with respect to liquidating distributions and dividends. The nonvoting stock had a preference in liquidation of up to $100 per share before any amount could be paid to the holders of the voting stock. Each share of the nonvoting stock was granted a right to receive ten times the dividends paid by Tensaw on each voting share. If, for example, a dividend of 10 cents per share was declared on the voting stock, each share of nonvoting stock was to receive a $1 dividend. No dividend could be paid on the *134 common stock unless Tensaw's directors certified that Tensaw's net worth was sufficient to pay the dividend and liquidate at $100 per share the then outstanding nonvoting shares. If the directors determined that they could not properly make such a certification, they were authorized to declare dividends to be paid only to the nonvoting shares. The nonvoting stock was callable at $100 per share by a majority vote of Tensaw's directors. A call was not required to be complete or pro rata, and Tensaw's directors had the authority to call any or all of the holdings of any holder without calling any shares held by any other holder or holders. On October 8, 1969, Tensaw's shareholders executed a trust agreement which established four irrevocable trusts for the benefit of the children of decedent and his three siblings. The trustees of the trusts were the five individual shareholders of Tensaw and two independent trustees -- The First National Bank of Mobile, [3] and W. Dewitt Reams. *135 The trust agreement provided that each family trust was to accumulate its net income for each beneficiary until each beneficiary became 21 years old, at which time the accumulated income was to be paid to the beneficiary. Net income thereafter was to be paid to the beneficiary currently. The independent trustees, acting together in their sole discretion, could pay to any beneficiary of any family trust (or to his or her descendants), first from accumulated income and then from principal of the trust, such sums as the independent trustees considered necessary for the support, maintenance, and education (including college and professional education) of the beneficiary. The independent trustees would first, however, have to consider cash resources available to the beneficiary. The powers expressly given to the trustees of the irrevocable living trusts included the power to continue to hold at the risk of the trust estates and without liability to the trustees all classes of Tensaw stock, it having been the grantors' intent that Tensaw voting stock remain an asset of the trusts until they terminated. Nonetheless, the trust agreement authorized the trustees, by unanimous vote, to sell *136 the Tensaw stock or liquidate the company if significant adverse changes with respect to Tensaw made the sale or liquidation imperative. Each family trustee or successor trustee who was a descendant of Frank Boykin could select his or her successor as a trustee. No approval of the successor by the other trustees would be needed if the successor trustee was a descendant of the designating trustee. If the successor trustee was not a descendant, three other trustees would have to approve in writing the successor trustee. The family trustees or their successors could remove the corporate trustee or W. Dewitt Reams by unanimous vote, with or without cause, provided a successor corporate trustee could be simultaneously appointed by a majority vote of the remaining trustees. The decedent and each of his three siblings transferred their voting shares to the trust for the benefit of their own children. Ocllo G. Boykin, individually and as executrix of the estate of Frank W. Boykin, transferred 3,000 voting shares to each of the four trusts. Immediately following the transfers of stock to the trusts, Tensaw's stock was owned as follows: Stockholder
Voting Shares
Nonvoting Shares
Ocllo G. Boykin
0
13,125
Estate of Frank W. Boykin
0
31,875
Frances Boykin Smith
0
26,250
Frances Boykin Smith
Family Trust
10,000 0 James R. Boykin
0
26,250
James R. Boykin
Family Trust
10,000 0 Richard A. Boykin
0
26,250
Richard A. Boykin
Family Trust
10,000 0 Decedent
0
26,250
Decedent's Family Trust
10,000 0 Total Shares
40,000 150,000 *137 Tensaw paid the following dividends per share in the years following the issuance of its nonvoting shares: Shares
Outstanding
on Last
Dividends
Dividend Date
Per Share
Year
Nonvoting
Voting
Nonvoting
Voting
1970
150,000
40,000
$ .40
1971
150,000
40,000
.40
1972
144,370
40,000
.50
1973
142,525
40,000
.40
1974
142,525
40,000
3.75
1975
115,980
40,000
2.00
1976
115,980
40,000
.60
1977
115,980
40,000
1978
115,980
40,000
4.00
.40 1979
113,350.5
40,000
4.50
.45 1980
107,225.5
40,000
5.85
.585
1981
105,786.5
40,000
6.50
.65 Tensaw redeemed 45,037 of the nonvoting shares from 1971 through 1981 at prices ranging from $75 to $114.81 (November 1973) a share. Decedent owned 22,444.5 shares of the nonvoting stock when he died on June 26, 1980. OPINION The issue for decision is whether decedent retained either the right to income from, or the enjoyment of, the voting stock that he transferred to a family trust for the benefit of his children such that the value of the stock is includable in his gross estate under section 2036(a)(1). Respondent bases his argument that decedent *138 retained the right to income from, and the enjoyment of, the voting stock on the dividend rights of the nonvoting stock that decedent retained. According to respondent, by retaining the nonvoting shares, decedent in fact "earned dividends from the equity in [Tensaw] attributable to the voting stock transferred in trust." [4] Respondent reasons that the effect of the dividend rights enjoyed by the nonvoting shares was that decedent retained "nearly all the income from the transferred property" and that "this retention of income constituted a retention of the enjoyment of the transferred voting common stock or a right to income from the transferred stock." As we will explain more fully, respondent's argument ignores the separate existence of Tensaw's two classes of stock. Section 2036(a)(1) *139 provides, in relevant part, that a decedent's gross estate includes the value of interests in property that a decedent has transferred, but has retained the enjoyment of, or the right to the income from. By its terms, this portion of section 2036(a)(1) applies only if a decedent (1) transferred property, and (2) retained the enjoyment of, or the right to the income from, the transferred property. Although it is apparent that decedent transferred property -- the voting shares -- it is equally apparent that he retained no right to the income from the transferred property. It is important to recognize at the outset that shareholders have no legal title to a share of corporate earnings and assets until a dividend is declared or a division is made on the winding up or dissolution of the corporation. See Eisner v. Macomber,252 U.S. 189, 208 (1920); Rhode Island Hospital Trust Co. v. Doughton,270 U.S. 69, 81 (1926). The corporation itself is the owner of its earnings and assets. Eisner v. Macombersupra at 208; Martin Truck Line v. Alabama Tank Lines,261 Ala. 163, 73 So.2d 756, 759 (1954). *140 Shareholders have the right to receive dividends on their stock only after the dividends have been declared, and only if their receipt of the dividends is consistent with their rights as shareholders. Eisner v. Macomber,supra at 208; Ala. Code sec. 10-2A-67 (1975).[5] The rights of shareholders are established by the corporate documents that govern the rights of the shares, interpreted in light of the statutory and constitutional provisions that bear upon those rights. Mobile Press Register, Inc. v. McGowin,271 Ala. 414, 124 So.2d 812, 821 (1960). The rights of Tensaw's shareholders are governed by Tensaw's articles of incorporation. Tensaw's articles of incorporation, as amended on October 7, 1969, created two separate classes of stock: voting stock and nonvoting stock. The articles of incorporation established the distinct rights of each class. See Ala. Code sec. 10-2A-91(a)(5) *141 (1975). Holders of the voting shares were given the right to receive any dividends that were declared on them by Tensaw's directors, and holders of the nonvoting shares were given the right to receive dividends per share of ten times the dividends per share paid on the voting stock. Holders of the nonvoting shares were given the right to receive $100 per share of a liquidating distribution before any amount could be paid to the holders of the voting shares. It is not clear from this record what rights holders of the voting and nonvoting shares have to liquidating distributions once the $100 per share preference is paid to the nonvoting shares. When decedent gave his voting shares to the trust for the benefit of his children on October 8, 1969, he transferred with the voting shares the right to receive all dividends and liquidating distributions that were subsequently declared on them. The only rights decedent retained were those accorded to the Tensaw nonvoting shares he retained, which were separate and distinct rights from the rights enjoyed by the voting shares that he transferred. Respondent points to Estate of Cooper v. Commissioner,74 T.C. 1373 (1980) *142 and Overton v. Commissioner,6 T.C. 304 (1946), affd. 162 F.2d 155 (2d Cir. 1947), to support his argument that decedent retained an interest in the voting shares. In Estate of Cooper, a decedent retained the interest coupons from bearer bonds that she transferred to a trust for her grandchildren. This Court held that the value of the bonds was includable in the decedent's gross estate as the decedent had retained the income from the transferred bonds. In Overton, a common shareholder caused his corporation to reissue his stock into two classes. He transferred the class B shares to his wife. The class B shares had a right to receive only $1 per share of distributions of the corporation's capital, yet received dividends of $150.40 a share in the six years after he transferred them to his wife. This Court considered the amount of dividends that the class B shares received in proportion to the liquidation value of the shares and concluded that the reissuance of two classes of stock was in substance simply a device to shift income from one taxpayer to another. We accordingly held that the dividends paid on the class B shares were taxable *143 to the class A shares. Neither Estate of Cooper nor Overton supports respondent's position in this action. This is not a case such as Estate of Cooper in which a taxpayer has attempted to reduce his estate by transferring an asset while retaining the bare right to the income therefrom. As we have already discussed, Tensaw's voting shares were separate and distinct from its nonvoting shares. When decedent transferred his voting shares he gave up the right to receive the dividends to which those shares subsequently became entitled as well as the assets those shares might subsequently receive in a liquidation of Tensaw. This is similarly not a case such as Overton in which a taxpayer has attempted to shift income by creating a class of stock that has been paid dividends that represent an excessive return on the liquidation value of the shares. Neither class of Tensaw's stock was designed to be paid dividends that represent an excessive return on the liquidation value of the shares. By prohibiting Tensaw's board from declaring dividends on the voting shares until Tensaw's net worth was sufficient to redeem all nonvoting shares at their $100 per share call price, *144 Tensaw's articles of incorporation guaranteed that dividends would not be paid on the voting shares until those shares had a positive liquidation value. The dividends paid on the nonvoting shares, which reached $6.50 a share in the year after decedent's death, do not represent an excessive return on their $100 a share liquidation value. The fiduciary duties of the trustees of the family trusts to the trusts' beneficiaries, and of the directors of Tensaw to the voting shareholders, limited Tensaw's ability to pay dividends to the nonvoting shares that represented an unreasonable return on their $100 per share call price. [6] See Chambers v. Commissioner,87 T.C. 225, 235 (1986). *145 This is a case in which a taxpayer transferred his entire interest in shares of stock and retained no right to income from or the enjoyment of the shares. We therefore hold that no part of the value of the voting stock is includable in decedent's gross estate under section 2036(a)(1). [7]
*146 To reflect the foregoing, An appropriate Order will be issued.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect at the date of decedent's death, are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Tensaw's board was authorized to issue an additional 40,000 shares.↩
3. AmSouth Bank N.A., one of petitioner's co-executors, is the surviving corporation of a merger between the First National Bank of Mobile and AmSouth Bank N.A. Pursuant to the merger, AmSouth Bank N.A. became responsible for all of the obligations of the First National Bank of Mobile.↩
4. Respondent actually asserts that 91 percent of the value of the voting stock is includable in decedent's estate. According to respondent, the voting stock is entitled to all of Tensaw's dividends, and as decedent retained the right to receive ten-elevenths of Tensaw's dividends, sec. 2036(a)(1)↩ requires decedent to include ten-elevenths of the value of the voting stock in his gross estate.
5. But see Holcomb v. Forsyth,216 Ala. 486, 113 So. 516, 521↩ (1927) (granting shareholder limited right to compel dividends if he can demonstrate that directors abused their discretion and violated business judgment rule in failing to declare them).
6. The trustees of the family trusts are under a fiduciary duty to vote the voting shares in the best interests of the beneficiaries. See Fulton National Bank v. Tate,363 F.2d 562, 569-570 (5th Cir. 1966). The directors of Tensaw are similarly under a fiduciary duty to the voting shareholders. Johnston v. Livingston Nursing Home, Inc.,282 Ala. 309, 211 So.2d 151, 156 (1968); Holcomb v. Forsyth,supra at 113 So. 516, 519-520. Cf. United States v. Byrum,408 U.S. 125↩ (1972).
7. We recognize that this holding does not resolve the parties' dispute over the proper valuation of the nonvoting shares held by decedent on the date of his death. The thrust of respondent's argument in this case, as we see it, is that Tensaw's issuance of nonvoting shares stripped the voting shares of much of their value. Indeed, much of the argument presented by the parties in this proceeding regarding the rights of Tensaw's two classes of stock was more relevant to the issue of the relative values of the two classes than the issue of whether the voting shares are properly includable in decedent's estate under sec. 2036(a)(1). The preferences enjoyed by the nonvoting shares, although not cause to hold the transferred voting shares includable in decedent's estate, are highly relevant to the value of the nonvoting shares. Tensaw's issuance of the nonvoting shares undoubtedly significantly reduced the value of the voting shares. Considering the dividend and liquidation preferences enjoyed by the nonvoting shares, it appears that the value of those shares represented the bulk of the value of Tensaw's equity. We stress here that valuation issues are best resolved by settlement. Litigation is an inefficient, wasteful, and inherently imprecise method of resolving valuation disputes. See Symington v. Commissioner,87 T.C. 892 (1986), quoting Messing v. Commissioner,48 T.C. 502, 512 (1967). We caution the parties that a decision regarding the fair market value of property may result in a significant financial setback for one of the parties, particularly when we find the evidence of value presented by one party to be substantially more convincing than that presented by the other party. See, e.g., Strasser v. Commissioner,T.C. Memo. 1986-579↩ n. 11. We invite the parties herein to consider the possibilities of resolving such issues through an agreement to submit to binding arbitration, under the supervision of the Court, which might enable the matter to be resolved with significant savings of time and money to all concerned.