ROBERT E. AND BEVERLY H. LOSCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent ROBERT E. LOSCH, P.C., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Losch v. Commissioner
Docket Nos. 43346-85; 43347-85.
United States Tax Court
T.C. Memo 1988-230; 1988 Tax Ct. Memo LEXIS 252; 55 T.C.M. (CCH) 909; T.C.M. (RIA) 88230; May 23, 1988. Collins Denny, III and Evelyn E. Small, for the petitioners. Richard K. Delmar, for the respondent. KORNER
MEMORANDUM FINDINGS *254 OF FACT AND OPINION KORNER, Judge: In timely statutory notices of deficiency, respondent determined deficiencies in Federal income tax as follows: Taxable
Petitioner
Year
Deficiency
Robert and Beverly Losch
1980
$ 43,363
1981
48,613
1982
39,404
1983
44,984
Robert E. Losch, P.C.
1980
5,531
1982
1,273
1983
283
1984
6,555
In addition, respondent in his answer determined that interest on a portion of the deficiency in tax of Robert and Beverly Losch (hereinafter the Losches) must be computed pursuant to section 6621(c). [1]
All issues with respect to the tax liability of Robert E. Losch, P.C. have been resolved. With respect to the Losches individually, after concessions the issues for determination are:
1. The fair market value on December 24, 1980, of a scenic, open *255 space, architectural facade and partial interior easement (hereinafter the conservation easement) donated on that date by the Losches to the National Trust for Historic Preservation in the United States (hereinafter the National Trust).
2. Whether any underpayment of tax attributable to the claimed easement donation was a substantial underpayment attributable to a tax motivated transaction, such that interest thereon is computed under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The Losches (hereinafter sometimes referred to as petitioners) are husband and wife. They resided in Washington, D.C., at the time they filed their petition for redetermination. Petitioners filed joint tax returns during each of the years at issue. Mr. Losch was employed as an attorney by his wholly owned professional corporation, Robert E. Losch, P.C. On November 3, 1978, the Losches entered into a contract to purchase real property located at 1716 New Hampshire Avenue, N.W., in Washington, D.C. (hereinafter sometimes referred to as "the property"). *256 The contract provided that the sale was contingent on the Losches' ability to obtain rezoning of the building at 1716 New Hampshire Avenue for use as a law office. At the time the contract for sale was entered, the property had an R-5-C zoning designation. The R-5-C designation permits general residential use to a maximum height of sixty feet and a maximum ratio of above grade building floor area to lot size of 3.5. This floor area ratio is hereinafter referred to as the "FAR". Despite its R-5-C zoning designation, the property has been used by its prior owner, a nonprofit organization, as offices. On November 10, 1978, the Losches joined with other property owners in the 1700 block of New Hampshire Avenue, N.W., in a petition to the District of Columbia Zoning Commission to have the west side of New Hampshire Avenue, between R Street and Riggs Place, including 1716 New Hampshire Avenue, rezoned from R-5-C to SP-1. SP-1 zoning is designed to act as a buffer between adjoining commercial and residential areas. It allows mixed residential and office use. Use of a building in an SP-1 zoned as a professional office is not permitted as a matter of right, but may be allowed by approval *257 of the Board of Zoning Adjustment. Buildings in an SP-1 zoned area may not exceed 65 feet in height, and cannot have a FAR exceeding 2.5 if used as offices, or 4.0 if used for residential or mixed residential/office purposes. The Losches waived the contingency in the purchase contract relating to rezoning of the property for use as a law office and took title to the property on March 23, 1979, while their petition for rezoning was still pending. On that same day, the Losches entered into an agreement with Robert E. Losch, P.C., for lease of the property. The lease was for a five-year term commencing March 24, 1979, at an annual rental of $ 28,800 payable in $ 2,400 monthly installments. The rental was subject to increase by the Losches at the end of each year of occupancy by an amount not exceeding the increase in the Consumer Price Index in the preceding year. The lease agreement further provided that the lessee was responsible for insurance, real estate taxes, repairs, utilities, restoration costs, and settlement costs incurred by petitioners in purchasing the property. [2] On June 14, 1979, the petition to rezone 1716 New Hampshire Avenue, N.W., to an SP-1 zoning designation *258 was granted by the District of Columbia Zoning Commission. Application before the Board of Zoning Adjustments to permit a law office at 1716 New Hampshire Avenue was made by petitioners on August 28, 1979, and granted on December 5, 1979. Beginning in April 1979, petitioners embarked on an extensive program of renovation and restoration of the property. The rehabilitation involved the removal of layers of paint from the walls and ceilings and repainting; recasting and replacing plaster moldings; restoring parquet floors; rehanging original hardware, chandeliers and ornamental plates; the installation of new wiring and plumbing; and the installation of HVAC equipment and duct work. The restoration also included resetting and repointing stonework in the building's facade, *259 cleaning the facade, and landscaping. The rehabilitation work was substantially completed by the fall of 1980 at a total cost to petitioners of approximately $ 115,000, of which $ 15,000 was attributable to installation of the central air conditioning system. On December 24, 1980, 1716 New Hampshire Avenue, N.W., consisted of a semi-detached three-story and full basement townhouse with mansard roofed attic, set on a 2104-square foot triangular parcel of land located at the corner of New Hampshire Avenue and Riggs Place in Washington, D.C. The building was designed by noted architect Clarke Waggaman and was completed in 1910. It is a tan limestone surfaced masonry structure designed in the Louis XVI style. The building has a gross building area of 1,753-square feet per floor, including the basement, for total gross building area of 7,012-square feet. The total height of the structure is approximately 45 feet. The arched front entry way has a keystone at the top above which is a bas-relief garland. The entrance is equipped with intricate wrought iron and glass double doors which are surmounted by a semicircular iron and glass transom. The entry foyer was painted to simulate *260 the limestone of the exterior and features an 18-foot ceiling. At the second floor line of the two principal facades there are full length iron balconies supported by ornate limestone brackets. All of the windows are double-hung wood casement with four panes, but have the appearance of transomed casements. The second floor windows are surmounted by elaborate carved keystones. The second floor facade is capped by a limestone frieze and dentilled wood cornice. The third floor supports the slate mansard roof and includes eight dormers surmounted by neoclassical pediments. The principal rooms of the first floor are the entry vestibule and stair hall, dining room, drawing room and conservatory (hereinafter the "Public Rooms"). All of these rooms have 12-foot ceilings and all are connected by glassed "French" doors. There are fireplaces in the drawing room and dining room. The trim on the fireplace mantels has been overlaid with gold leaf. The baseboards and mantels are Siena Marble. Floors are basketweave oak parquet or red pine. The walls and ceilings are plaster and are finished with moldings and sculptured foliate cornices, elaborate inset panels and garlanded bas-relief. *261 The foliate cornice moldings have been highlighted with gold leaf and paint. The hand railing on the main staircase is overlaid with gold leaf which also trims the wrought iron balustrade. A secret staircase from the basement opens into the front hall from a panel under the main staircase. The dining room is equipped with an elaborate crystal chandelier and sconces which flank the fireplace. The mirror over the fireplace in the drawing room and the mirrored cabinet doors in the dining room match the room entrance French doors. All of the hardware throughout the first floor is the original brass. Radiators are elegantly sculptured and surmounted by benches. There is also a small kitchen on the first floor equipped for office use. A second staircase is located adjacent to the kitchen. The second floor consists of a library, three bedroom/offices and two bathrooms. The library, which is located at the front of the second story, is dominated by a massive floor to ceiling limestone fireplace. The library also features an exposed beam ceiling and built-in book shelves. One of the three bedroom/offices also has a fireplace. All of the ceilings on the second level are 11-feet *262 high. The bathrooms have full, ceramic-tiled baths. The dressing hall in the front bathroom has been converted into a file room. The third floor consists of two rooms and a full bath in the front of the building which were used as a residential suite. There are also three additional office/bedrooms, a full bath, and a small kitchen at the rear of the third floor. The attic is unfinished storage space which is serviced by a separate staircase. The basement is also unfinished and contains the original kitchen, a pantry, storage room, utility room, coal bin, and a one car garage. The building is heated by a gas-fired hot water furnace supplemented by electric heat pumps. The building is equipped with two-zone central air conditioning. One system services the first floor while the other services the remainder of the building. The compressors are mounted on the roof. The property is located approximately four blocks northeast of Dupont Circle within the confines of the Dupont Circle Historic District, which was entered into the National Register off Historic Places on July 21, 1978. It is also in the District of Columbia Inventory of Historic Sites. Development around *263 Dupont Circle began in the mid-1870s and continued for approximately 40 years. Between 1895 and 1910, most of the original Victorian mansions in the area were razed. New townhouses, many designed by nationally known architects, were commissioned by the District's elite, for whom Dupont Circle had become a fashionable address. However, by the 1950s the Dupont Circle area had ceased to be a desirable address. The wealthy moved elsewhere and their residences were subdivided into apartments and converted to commercial use. During the 1960s the area became known as a gathering place for members of the counterculture and developed a reputation as an unsafe neighborhood. The area then began to experience a revival in the 1970s, sparked in large part by the development of the Metro mass transit system, whose Dupont Circle station opened in 1977. The area became an increasingly desirable office location, causing property values to appreciate rapidly. Many older buildings were renovated and restored. However, others were razed and replaced by commercial developments. By the late 1970s fear spread that unbridled commercial development in the area posed a threat to retention of its *264 unique architectural and historic character. It was these concerns which provided impetus for the area's designation as an historic district in 1978. By deed dated December 24, 1980, the Losches conveyed a scenic, open space, architectural facade and partial interior easement in 1716 New Hampshire Avenue to the National Trust for Historic Preservation in the United States. The easement is in gross and in perpetuity. It qualifies as a "qualified conservation contribution" within the meaning of section 170(h). The easement imposed the following restrictions on the Losches' use and affirmative duties as to the maintenance of the property, which the National Trust is entitled to enforce: 1. No construction, alteration or remodeling of the building which affects its exterior surface, increases its height, alters the facade or appearance of the building or adversely affects its structural soundness is allowed without the express written consent of the National Trust. 2. No construction, alteration or remodeling of the interior surfaces of the "Public Rooms" (i.e., the first floor with the exception of the kitchen) may be undertaken without the express written consent of the *265 National Trust. 3. The property may be used only for purposes allowed under zoning ordinances in effect at the time of the conveyance, except that in no event may the property be used as a boarding house, dormitory or rooming house and no industrial activities may be engaged in. 4. The property may not be subdivided, devised, or conveyed except as a unit. 5. No extension of the existing structure or erection of additional structures on the property is permitted, except to repair damage caused by a casualty and then only if the design is approved by the National Trust. 6. No utility transmission lines except those already existing may be created. 7. No dumping of unsightly or offensive materials in areas visible from the public way is allowed. 8. No topographical changes are permitted without the prior approval of the National Trust. 9. No signs are allowed on the property other than a small sign announcing the National Trust interest, dignified professional markers identifying the address and tenant, and markers directing or restricting parking or passage of persons. 10. No painting of the exterior of the building or the Public Rooms which significantly *266 differs from the quality and color of the paint in use at the time of the easement may be undertaken without prior written consent of the National Trust. 11. The National Trust must give prior written approval to the cleaning processes utilized in areas of the building subject to its easement. 12. The easement requires the Losches or any future owners of the property to maintain the lot, building exterior, and Public Rooms in a good and sound state of repair at all times. 13. The easement requires that the owners submit to an annual inspection (or more frequent inspection if evidence of violations are found) of the property by the National Trust to assure compliance with the terms of the easement. The conveyance of the easement by petitioners qualified as a charitable contribution to the National Trust under section 170(c). On their Federal Tax return for 1980, petitioners reported the value of the donated easement as $ 215,000. As a result of the charitable contribution deduction limitations of section 170(b) and the carryover provisions of section 170(d)(1), petitioners deducted the following amounts as charitable deductions on their joint tax returns: Taxable
Year
Amount
1980
$  46,494
1981
58,224
1982
57,245
1983
53,037
$ 215,000
*267 In a timely statutory notice of deficiency, respondent determined that the donated easement had no value and disallowed the charitable deductions taken with respect to the easement. In his trial memorandum, respondent conceded a $ 70,000 easement value rather than zero as determined in his notice of deficiency. In an amendment to their petition, petitioners maintain that the easement had a value of $ 350,000 rather than the $ 215,000 claimed on their tax returns. The parties agree that the fair market value of the easement on December 24, 1980 is the only matter now at issue. To establish the fair market value of the donated easement, each party offered the report and testimony of an expert witness: Judith Reynolds for petitioners, and Harry A. Horstmann III for respondent. Ms. Reynolds is a member of the American Institute of Real Estate Appraisers and is qualified to give an opinion as to the value of an interest in real estate. Ms. Reynolds has served as editor-in-chief of The Appraisal Journal and has authored or co-authored several articles on preservation easements and the valuation of historic properties. Ms. Reynolds is a principal in a real estate and consulting *268 firm and practices primarily in the Metropolitan Washington, D.C. area. Ms. Reynolds' report appraising the subject premises is dated December 5, 1980. Her report is supplemented by additional market analysis prepared by her in May 1985 and August. In her report, Ms. Reynolds placed the value of the easement at $ 215,000, determined by comparing a pre-easement value of the property of $ 850,000 with its value subject to the easement of $ 635,000. In a letter dated September 27, 1985, she modified her report increasing her calculation of the easement's value to $ 235,000. Respondent's expert witness, Harry A. Horstmann III, is also a member of the American Institute of Real Estate Appraisers and is qualified to give an opinion as to the value of an interest in real estate. He is president and owner of a Washington-based firm called Real Estate Resources. He is also licensed as a real estate broker in Maryland and Washington, D.C., and is a member of the Washington, D.C. Association of Realtors. Prior to his testimony in this case, Mr. Horstmann had never testified as to the value of an easement encumbered historic property for the purpose of valuing the easement. Mr. Horstmann *269 prepared a written report which is dated June 8, 1987, appraising the subject premises as of December 24, 1980. In his report, Mr. Horstmann valued the easement at $ 70,000, based on a preeasement value of the property of $ 600,000 and a value subject to the easement of $ 530,000. ULTIMATE FINDING OF FACT The preservation easement on 1716 New Hampshire Avenue, N.W., donated to the National Trust on December 24, 1980, had a fair market value on that date of $ 130,000. OPINION Burden of Proof
Before reaching the substantive issues for decision, we must first address petitioners' argument that respondent should bear the burden of proof as to the value of the easement. The general rule is that respondent's deficiency determination is presumptively correct and petitioner bears the burden of disproving it. Rule 142(a); Welch v. Helvering,290 U.S. 111, 115 (1933). Petitioners argue, however, that since respondent's deficiency notice is "naked and without foundation" the burden of proof should be shifted to respondent. Petitioners rely primarily on United States v. Janis,428 U.S. 433 (1976) *270 and Helvering v. Taylor,293 U.S. 507 (1935), in support of their position. In asking the Court to determine that a deficiency notice lacks foundation, the petitioner is effectively asking us to look behind the notice and examine the evidence relied upon and the motive of respondent in issuing the notice. As a general rule, this Court will not look behind a notice of deficiency. Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 327 (1974). An exception to this general rule is recognized in the rare case involving unreported income where the respondent introduces no direct evidence, but rather relies on the presumption of correctness which normally attaches to his deficiency notice. Jackson v. Commissioner,73 T.C. 394, 401 (1979). The rationale for the exception is that it is necessary to avoid placing the taxpayer in the untenable position of disproving a determination that he received unreported income when he is provided with no information as to the source of the income he is alleged to have received. A deviation from the *271 general rule of Greenberg's Express, Inc. is unwarranted in this case. First, this case involves a controversy as to the proper amount of a deduction, not inclusion of unreported income. Janis is therefore inapposite. Deductions are matters of legislative grace and taxpayers must satisfy the specific statutory requirements of the deduction they claim. Deputy v. duPont,308 U.S. 488, 493 (1940). As regards entitlement to a deduction, the burden of proof is usually on the taxpayer. Chaum v. Commissioner,69 T.C. 156, 163-164 (1977). Second, respondent does not rely exclusively on the presumption of correctness which attaches to his deficiency notice. At trial, respondent introduced an expert report in support of his position as to valuation of the easement. He also presented lengthy testimony from the expert who prepared the report. Helvering v. Taylor, supra is therefore distinguishable. We thus hold that petitioners bear the burden of proof as to the value of the easement. Valuation of the Conservation Easement
*272 The parties agree that the conservation easement donated by petitioners to the National Trust qualifies as a "qualified conservation contribution" within the meaning of section 170(h). The donation may thus form the basis for a charitable contribution deduction under section 170(a). The amount of the deduction allowed is the fair market value of the easement on the date of contribution. Sec. 1.170A-1(c)(1), Income Tax Regs.Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.
Since conservation easements are generally donated as gifts, there is no established market to which one might refer in order to determine their fair market value. Symington v. Commissioner,87 T.C. 892, 895 (1986); Hilborn v. Commissioner,85 T.C. 677, 688 (1985). *273 [3] Thus the only feasible method of determining the fair market value is to determine the fair market value of the property immediately before the easement was granted and immediately after imposition of the easement. The diminution in value, if any, of the property after imposition of the easement is the easement's fair market value. See sec. 1.170A-14(h)(3), Income Tax Regs. (especially example 12). Both experts have used this "before and after" approach. [4]
Petitioner's expert, Ms. Reynolds, indicated *274 in her report and a supplement thereto that the subject property suffered a $ 235,000 diminution in value as a result of imposition of the easement. She attributes $ 25,000 of this loss to loss of the right to develop the property to the extent of the then existing zoning regulations. An additional $ 10,000 is attributable to loss of the opportunity to take advantage of any increased development potential which may be created as a result of zoning law changes which may occur at some time in the future. The remaining $ 200,000 is attributable to loss in market value and income potential of the building itself as a result of higher expenses and lower rental income as a result of the easement. [5]
Highest and Best Use
We first address the $ 35,000 diminution in value which Ms. Reynolds attributes to loss of development rights. Implicit in the placement of a value on development rights lost as a result of the easement is the argument that the building as it existed at the time of the easement *275 was not the highest and best use of the property. The fair market value of property, by definition, should reflect the highest and best use of such property as of the date of valuation. Symington, v. Commissioner, supra at 896; Stanley Works v. Commissioner,87 T.C. 389, 400 (1986). If the easement would preclude a potential buyer from putting the property to its highest and best use, then the property encumbered by the easement would have less market value than the property unencumbered. Conversely, an easement which limits potential uses of a property will have no effect on the market value of the property unless one of the uses precluded by the easement is the property's highest and best use. In determining the value of property the realistic, objective potential uses to which the property could be placed control. Stanley Works v. Commissioner, supra at 400; United States v. Meadow Brook Club,259 F.2d 41, 45 (2d Cir. 1958). The highest and best use of property need not be the use to which its owner has actually put *276 it. However, any suggested use which differs from current use requires that such use be reasonably probably within the foreseeable future to constitute the property's highest and best use. S. Rept. 96-1007 (19980), 1980-2 C.B. 599, 606; Olson v. United States,292 U.S. 246, 255-256 (1934); Hilborn v. Commissioner, supra at 689. In determining whether a potential use is reasonably likely, existing zoning and historic preservation laws as well as current market conditions must be taken into account. Petitioners have not proven that the building as it existed on the valuation date was not the property's highest and best use and we therefore place no value on the easement prohibitions against further development of the property. At trial, petitioner introduced architectural drawings illustrating how two floors of residential area could be added to 1716 New Hampshire Avenue to take full advantage of development allowed under existing zoning regulations. They also introduced the testimony of a former zoning board official and a former official of the District's Historic Preservation Review Board that the proposed addition would in their *277 opinion meet then existing zoning requirements and would have been approved by the Preservation Review Board had it been submitted. They also presented the testimony of an architect familiar with the Dupont Circle area who testified that a market existed for such mixed business/residential developments. Assuming without deciding that the proposed residential addition would meet zoning requirements, be approved by the Preservation Review Board, and that a market existed for such property, petitioners have failed to offer evidence as to another crucial element which must be shown before the addition can be considered to constitute the property's highest and best use -- the economic feasibility of the project. Without such evidence we cannot find that such an addition was a reasonable likelihood within the foreseeable future as required in order for the addition to constitute the property's highest and best use. Olson v. United State, supra at 257; Stanley Works v. Commissioner, supra at 401. Without evidence as to the economic viability of the proposed addition, we can only conclude that its possibility is so speculative and remote that its preclusion *278 would have no effect on the amount that a prospective buyer would be willing to pay for the building. We thus hold that petitioners have failed to prove that the property's highest and best use both before and after the easement donation is other than as developed. We thus reduce the easement value by the $ 25,000 Ms. Reynolds calculated as the diminution in property value attributable to lost development rights. [6] We also reduce the easement value by the $ 10,000 representing loss of potential development rights which may arise in the future since such rights are by Ms. Reynolds' own admission "highly speculative." We now turn to the task of determining the diminution in value of the building itself as a result of imposition of the easement. Each of the experts relied on two of the commonly *279 recognized methods of valuing property; the "comparable sales" method and the "capitalization of income" method. In addition, Mr. Horstmann made use of a third valuation technique; the "replacement cost" method. Under this method, the value of property is determined by calculating the actual cost of reproducing the property today less depreciation. However, in dealing with an older, historic structure, it is highly questionable whether the replacement cost method can be used to provide meaninghful results. It is extremely doubtful that a building such as 1716 New Hampshire Avenue could be constructed today. Even if it could, the construction methods and materials used would likely differ substantially from those utilized in 1910. See Stratton v. Commissioner,T.C. Memo. 1969-50. Mr. Horstmann himself testified that the cost method was not the preferred approach in valuing historic properties. We thus confine ourselves to an examination of the expert valuations utilizing the comparable sales and capitalization of income valuation methods. Comparable Sales
Ms. Reynolds identified 16 sales of noneasement-encumbered properties in the Dupont Circle area *280 which she considered comparable to the subject property. Of these she isolated seven which she identified as particularly relevant. These sales occurred between February 1979 and July 1980, at prices ranging from $ 345,000 to $ 1,100,000, which translates to a price range of between $ 60.42 and $ 110.10 per square foot of gross building area (GBA). Ms. Reynolds concluded from an examination of this data that the subject property had a pre-easement market value of $ 850,000 or $ 121.22 per square foot of GBA. In her initial report, Ms. Reynolds was unable to identify any sales of easement-encumbered property which she considered comparable to the subject. In a supplemental report dated May 24, 1985, she identified three sets of sales which in her opinion evidence a diminution in value of properties subject to easements of approximately 25 percent. She thus determines a post-easement market value for the subject property of $ 635,000. Mr. Horstmann's report identified nine sales of noneasement-encumbered properties which he considered comparable to the subject. [7] These sales occurred between May 1978 and July 1980, at prices ranging from $ 27.12 too $ 103.59 per square foot *281 of GBA. Mr. Horstmann was of the opinion that this data supported a pre-easement value of $ 606,000 or $ 86.42 per square foot of GBA for the subject. [8]
Mr. Horstmann considered his data largely inconclusive on the issue of whether the market imposed a discount on easement-encumbered properties. Nevertheless, he considered a 10-percent diminution in value of the subject as a result of the easement to be reasonable. Thus, Mr. Horstmann was of the *282 opinion that his market data indicated a post-easement property value of $ 545,400 and an easement value of $ 60,600 [9]
i. Pre-Easement
Ms. Reynolds' value of $ 121.22 per square foot of GBA is well above the price of any of her pre-easement comparables. Even after taking into account inflation adjustments and adjustments for the varying degrees of renovation of her comparables, we consider her figure to be excessive. Additionally, two of Ms. Reynolds' comparables (the two with the highest sale price per square foot) were in C-3-C zoned areas. An additional property was zoned C-2-A. We do not consider these properties truly comparable since their zoning designation allows for a broader range of commercial activities than do SP zoned properties. They would therefore be expected to command higher prices, all other things being equal. We consider properties with the same SP zoning designation and in the same general vicinity as 1716 New Hampshire Avenue (i.e., north and east of Dupont Circle) to be most comparable. Additionally, sales must be close *283 in time to the valuation date in order to minimize adjustments which must be made to account for the rapid appreciation in property values which took place in Dupont Circle during the late seventies and early eighties. We thus limit our consideration to sales of comparables which took place in 1980 or 1981. The transactions culled from both reports which meet these criteria are summarized below: Price Per
Sq. Ft. of
Sale Date
Location
Sale Price
GBA
GBA
Feb. 29, 1980
1605 New Hampshire
$   525,000
9,120
$ 57.57
Jan. 4, 1980
1607 New Hampshire
1,100,000
18,206
60.42
July 31, 1980
1706 New Hampshire
700,000
10,343
67.68
Each of these properties is within a block or two of the subject. We find 1607 New Hampshire particularly relevant since it occupies a corner lot as does the subject. These sale prices must be adjusted upward to account for any appreciation in value occurring between the sale date and the valuation date. Mr. Horstmann determined that a 1.75 percent a month rate compounded monthly, was appropriate. Ms. Reynolds' August 1986 report indicates a 24.58 percent increase in prices during 1980 which equals *284 a 1.85 percent appreciation rate compounded monthly. We found the data used by Ms. Reynolds in determining an overall appreciation rate in the Dupont Circle area more comprehensive and will utilize her rates. Using Ms. Reynolds' rate, the hypothetical sales price of these properties on December 24, 1980, would have been as follows: Hypothetical
Valuation
Value Per
Date Value
Sq. Ft. of GBA
1605 New Hampshire
$   630,537
$ 69.14
1607 New Hamsphire
1,370,422
75.27
1706 New Hampshire
767,138
74.17
Each of these properties was in need of some degree of renovation at the time of its sale. The hypothetical sale price must be adjusted upward to account for the value added by renovation to make comparable to the subject property. We do not find the testimony of petitioners' witness, that the cost of renovating historical property ranged between $ 60 and $ 70 per square foot in 1980, particularly useful. Each renovation is unique and any estimate as to what the "average" cost of a renovation is says little about what actual costs will be in a given circumstance. Further, this $ 60 to $ 70 range seems too high when compared to the $ 100,000 spent *285 on the property exclusive of the air conditioning system. Even if we assume, as witness Jennings testified, that the owner of a building in need of renovation can realize a 10 to 25 percent saving by acting as his own general contractor, this indicates renovation costs in the range of $ 21 to $ 26 per square foot for Mr. Losch. [10] In our judgment the hypothetical sales price of the comparables should be escalated by $ 30 per square foot of above-grade building area both to account for anticipated renovation costs and to account for the fact that the renovation would normally be expected to add more to the value of the property than its cost. An additional $ 15,000 is added to 1605 New Hampshire too account for the fact that this property was not equipped with central air conditioning at the time of its sale. This is the same amount paid by petitioners to have central air conditioning installed in their building. Our adjustments to the comparables are thus summarized below: Sale
Appreciation
Renovation
Price
Adjustment
Adjustment [11]
1605 New Hampshire
$   525,000
$ 105,537
$ 220,200
1607 New Hampshire
1,100,000
270,422
433,260
1706 New Hampshire
700,000
67,138
241,020
*286 Hypothetical
FMV Per
December 20, 1980
Sq. Ft.
Fair Market Value
GBA
of GBA
1605 New Hampshire
$   850,737
9,120
$ 93.28
1607 New Hampshire
1,803,682
18,206
99.07
1706 New Hampshire
1,008,158
10,343
97.47
Therefore, it is our best judgment, giving proper weight to the quality of the building at 1716 New Hampshire and the fact that smaller properties often have higher values per square foot than larger ones, that the property had a fair market value on December 24, 1980, prior to imposition of the National Trust easement, of $ 775,000 or approximately $ 110 per square foot of GBA. [12]
*287 ii. Post-Easement
In her analysis dated May 24, 1985, Ms. Reynolds analyzes three sets of sales of easement-encumbered and noneasement-encumbered properties which in her opinion demonstrate a 25 percent diminution in value of properties encumbered by an easement. We do not consider the sales identified by Ms. Reynolds as "Set 1" to be comparable to the subject since Set 1 consists of residentially zoned properties. In Set 2 she compares the July 7, 1982, sale of easement encumbered 1701 New Hampshire Avenue for $ 93.42 per square foot of unrenovated GBA with the sales of several unencumbered properties, particularly 1621 New Hampshire on April 4, 1983, for $ 114.46 per square foot of unrenovated GBA and 1523 New Hampshire for $ 153.61 per square foot of unrenovated GBA on April 30, 1982. [13] In Set 3 Ms. Reynolds compares the sales on May 19, 1982 and May 4, 1983, of 1800 Connecticut Avenue and 1731 21st Street, C-3 zoned commercial properties she identifies as encumbered by easements, for $ 143.97 and $ 137.83 per square foot of GBA, respectively, with the sale of noneasement-encumbered 1633 Connecticut Avenue for $ 130.96 per square foot of renovated GBA on June 17, 1982. *288 [14] From this data she draws the conclusion that easement-encumbered properties sold for 25 percent less than they would have unencumbered. We do not draw the same conclusions from her data as does Ms. Reynolds. First, we are wary of drawing any general conclusions from so few sales of easement-encumbered property. It would be much preferable to compare the sale of the same property both before and after an easement was imposed in order to draw an inference as to the effect of the easement. Second, Ms. Reynolds provided no details as to the severity of the restrictions and/or positive duties imposed by the easements which would certainly have an effect on the magnitude of the discount, if any, imposed by the market on the property by reason of the easement. As regards Set 2, we regard the proper methodology to be to deflate the 1982 sale of 1701 New Hampshire for the effects of appreciation *289 and compare it to the hypothetical market values of the comparable, unrenovated properties as of the valuation date which was developed earlier. Using Ms. Reynolds' appreciation rates, one would expect a property which sold for $ 575,000 in July 1982 to have had a value of $ 362,354 in December 1980. This works out to a hypothetical value of $ 58.87 per square foot of GBA for 1701 New Hampshire. This compares with a range of value of $ 69.14 to $ 75.27 per square foot of unrenovated GBA developed for the unencumbered comparable properties indicating a 15 to 22 percent market discount for easement-encumbered properties. In Set 3 a comparison of the sales of 1800 and 1633 Connecticut Avenue at about the same time indicates approximately 10-percent value diminution in 1800 Connecticut Avenue which may be attributable to the easement encubering it. If we assume the price of 1633 Connecticut Avenue is inflated by $ 164,275 to account for its renovation this results in a value of $ 159.76 per square foot of GBA. [15] The sales price of 1800 Connecticut Avenue is approximately 90 percent of this amount. Ms. Reynolds declines to include in her analysis the sale of easement-encumbered *290 1729 21st Street at about the same time as 1731 at a price substantially higher than that received for 1731 due to unspecified "special circumstances" attendant to that sale. Had this sale been included it would have seriously undermined Ms. Reynolds' theory as to the effect of easements on the market value of easement-encumbered properties in the Dupont Circle area. Mr. Horstmann identified the property at 1229 19th Street as indicative of the effect of an easement on the market value of property. [16] This property sold unencumbered on June 22, 1977, for $ 400,000. On December 18, 1979, a conservation easement on the exterior facade of the building was donated to the Defenders of Wildlife. In December of 1985, the property resold for $ 1,665,000. Using Ms. Reynolds' figures for appreciation rates in the Dupont Circle area, one would expect this building to have sold for $ 1,537,300 in 1985, thus indicating no diminution *291 in value as a result of the easement. Mr. Horstmann considered his analysis to be largely inconclusive on the issue of whether the market imposed a discount on easement-encumbered properties. Nevertheless, he considered a 10-percent diminution in value to the subject property as a result of the easement to be reasonable. We tend to agree with Mr. Horstmann's assessment as to the conclusiveness of the market value arrived at using the comparable sales approach. However, it is our best judgment that utilization of that method indicates a 15-percent diminution in value of the subject as a result of the easement, indicating an easement value of $ 116,250. We place particular weight on the analysis of the easement-encumbered sale of 1701 New Hampshire Avenue which indicates a value diminution in the range of 15 to 22 percent. When the results of this sale were weighed with the inconclusive results from the other sales of easement-encumbered property, we feel the 15-percent *292 figure is appropriate. Income Capitalization
In her initial report and a supplementary report dated September 27, 1985, Ms. Reynolds determined that the income capitalization approach to valuation indicates an easement value of $ 200,000. She derived this result by capitalizing her estimate of pre-easement net rental income of $ 84,400 at a 10-percent rate to arrive at a pre-easement property value of $ 845,000. [17] She capitalized her $ 67,600 estimate of post-easement net rental income at 10.5 percent to arrive at post-easement value of $ 643,810 which she rounded to $ 645,000. However, at trial the parties stipulated that the amounts actually recieved by the Losches from Robert E. Losch, P.C. approximated the fair rental value of the property in each year under the conditions existing at the time. These amounts are: 1980
$ 47,686
1981
36,800
1982
34,734
1983
60,141
Based on this stipulation, petitioners urge that the $ 36,800 figure should be used as the fair rental value of the property immediately after imposition of *293 the easement and that any other figures of either expert should be disregarded. They argue that Ms. Reynolds' results should be used for pre-easement net rental income since the stipulated amounts apply only "under the conditions existing at the time." Since renovation works was ongoing in 1980, they argue that the stipulated 1980 net rental value bears no relationship to the income potential of the property on December 24, 1980, when renovation had been substantially completed. Thus, at trial and on brief, petitioners argue that the income capitalization approach results in a $ 350,000 after easement value of the property (36,800 / .105), thus resulting in an easement value of $ 495,000 using the income capitalization approach. [18]
We do not consider the stipulated rental values arrived at by the parties as providing a meaningful *294 basis for application of the income capitalization method. This method is based on the premise that the value of an income-generating property is equal to the present value of the sum of the stream of income which it is expected to generate in the future and the proceeds from its final liquidation. Commissioner v. McCann,146 F.2d 385 (2d Cir. 1944). Focusing on actual results for a single year to make this determination could be misleading, especially when the rental agreement calls for varying payments from year to year as do the agreements in effect during the stipulated years. We consider the opinions of the experts to provide the best indication of what the proper net rental value to be capitalized should be. We thus rely on the experts' reports in determining the net rental values to be used in applying the capitalization of income method. The opinions of both experts as to the net rental value of the property were fairly close given the imprecision which must necessarily accompany efforts to estimate net rental value for a unique piece of property. Ms. Reynolds *295 determined a pre-easement net rental value for the property of $ 84,400 compared to the $ 70,009 estimate of Mr. Horstmann. [19]
We found Ms. Reynolds' opinion as to the pre-easement net rental value of the property to be the more persuasive. Ms. Reynolds generally used rentals of buildings of comparable size and architectural style as the subject. In contrast, Mr. Horstmann looked exclusively to multi-tenant, high-rise buildings for his comparable rentals. We agree with petitioners that the professional firms and non-profit organizations would find the subject more attractive and would pay a premium to occupy such space. Ms. Reynolds' estimate of post-easement rental value was $ 67,600 or $ 16,800 less than her estimate of pre-easement net rental value. She attributes this difference to a $ 9,800 reduction in gross rental income ($ 10,000 less a 2-percent vacancy factor) due to provisions in the easement which would make *296 the building less attractive to a potential tenant, and to increased maintenance costs of $ 7,000 due to the easement. We did not find that petitioners adequately substantiated any diminution in gross rental value of the property due to the easement. Ms. Reynolds projects a $ 5,000 income reduction attributable to the easement requirement that public access be provided to the first floor rooms covered by the easement and another $ 5,000 attributable to the prohibition against changing interior partitions. We found both of these dollar amounts highly speculative and based on nothing more than Ms. Reynolds' opinion unsupported by any objective analysis. There was no evidence introduced as to the number of visitors who would desire to inspect the public rooms, the frequency of visits or the extent to which they would interrupt normal office routines. We also have difficulty believing that a tenant who would be attracted to this building would insist on paying less rent due to his inability to install partitions in the first floor rooms. Nor did we find adequate substantiation by either petitioners or their expert for the $ 7,000 in additional expenses they attribute to the property *297 when encumbered by the easement. Ms. Reynolds provided no substantiation for this figure which appears to be based on nothing more than her opinion unsupported by any objective analysis. We found Mr. Horstmann's analysis of diminution in net rental value as a result of the easement more persuasive. Mr. Horstmann attributed $ 4,733 of lost rental value to the easement provisions prohibiting alteration of the interior areas of the building subject to the easement. This prohibition precluded installation of an elevator which would maximize the rental value of the building's upper floors. Mr. Horstmann posited increased costs of $ 2,308 after imposition of the easement which he categorized as follows: Miscellaneous
$    23
Insurance
198
Maintenance
989
Reserves
1,098
$ 2,308
Insurance costs are increased in recognition of the slightly higher insurance rates Mr. Horstmann believed may apply to the building as encumbered. The $ 989 increased maintenance costs are the difference between average actual maintenance costs taken from actual 1981 through 1986 inspection reports and his hypothetical normal maintenance costs for an unencumbered building of $ . *298 15 per square foot. [20] Mr. Horstmann derives his increased reserves amount by comparing a "normal" reserve of 1.5 percent of annual income to hypothetical reserve requirements he calculated as necessary to make required repairs and replacements to the subject building. In general, we adopt Mr. Horstmann's approach given the total lack of substantiation provided by either petitioners or their expert for the $ 7,000 figure. However, in applying Mr. Horstmann's methodology, we conclude that he understated the reserve requirements for the subject building. First, we believe Mr. Horstmann's figures were distorted by using a weighted average number of years for which repairs and replacements would be required and then constructing an overall reserve requirement. A better approach would be to calculate a reserve requirement for each individual repair or replacement required and then aggregate them. Second, we believe that Mr. Horstmann's use of a factor for earnings on his reserve fund of 13.5 percent compounded monthly is excessive. A conservative building manager *299 would not count on earning 13.5 percent year-in and year-out for a period ranging from 8 to 50 years in order to finance needed repairs and replacements, even during the highly inflationary early eighties. After giving effect to these adjustments, Mr. Horstmann's methodology indicates reserve requirements for the building in excess of normal reserves of approximately $ 4,800 determined as follows: Annual Reserve
Requirement
Assuming 10%
Earnings on
Reserve Balances
Floor Refinishing
15 yrs.
$ 12,500
$   393.42
Painting
8 yrs.
10,000
874.44
Plaster Work
15 yrs.
27,500
865.53
Stairwell
10 yrs.
17,500
1,098.04
Structural
30 yrs.
50,000
303.96
Roof
20 yrs.
3,500
61.11
Metal Work
15 yrs.
25,000
786.84
Gutters & Downspout
8 yrs.
8,000
699.55
Decorative Cornice
10 yrs.
15,000
941.18
Stone Facade
50 yrs.
40,000
34.37        Annual Reserve Requirements
$ 6,058.44        Normal Reserve Requirements (Est.)                 (84,500 x .015)
1,267.50        Extra Reserve Requirements as a        Result of Easement
$ 4,790.94
*300 We thus summarize the earning capacity of the subject before and after the easement: Net Rental Income -- Pre-Easement
$ 84,400 Net Rental Income Diminution:
Elevator
(  4,733)
Increased Expenses
Miscellaneous
$    23
Insurance
198
Maintenance
1,034
Reserves
4,800
(6,055)
Net Income -- Post-Easement
$ 73,612 To arrive at a value of the easement using the income capitalization valuation method, the net earnings from the building must be capitalized using the rate of return one would expect to be demanded by an investor in the building. In this way the amount of money an investor would be expected to pay for the building can be determined. Each expert used different capitalization rates for before and after the easement to account for perceived additional risks of ownership of an easement-encumbered property. Ms. Reynolds used 10 and 10.5 percent rates which she derived primarily from market data. Mr. Horstmann used rates of 12.15 percent pre-easement and 12.5 percent post-easement which he derived using the "band of investment" technique. This method *301 produces a hypothetical rate of return by reference to various market interest rates (i.e., home mortgages, the prime rate, Treasury obligations, etc.) which are weighted and combined to form a single, overall rate. We found use of Ms. Reynolds' rates to be most appropriate. As a general rule, we place more weight on a rate of return on realty which is determined by examining actual sales and rental data derived from the real estate market. More importantly, Ms. Reynolds' rates give recognition to the fact that an investor would expect a portion of his total return to come from future appreciation in the value of the property, whereas Mr. Horstmann's rates assume that the only return contemplated is through rentals. Thus, using Ms. Reynolds' capitalization rates, the income capitalization method indicates an easement value of approximately $ 143,000 determined as follows: Net Rental
Capitalization
Fair Market
Income
Rate
Value
Pre-Easement
$ 84,400
10.0
$ 844,000
Post-Easement
73,612
10.5
701,067   Easement Value -- Income Capitalization Method
$ 142,933
We can discern no reason for preferring the market value for the property derived *302 through application of the comparable sales approach over that derived using the income capitalization approach or visa versa. Therefore, it is our best judgment, based on a careful examination of all of the evidence before us, that petitioners have proven that the easement on the property donated by them to the National Trust on December 24, 1980, had a fair market value on that date of $ 130,000. At this point we feel constrained to reiterate once again our doubts as to the efficacy of using the judicial process to resolve valuation issues. See Symington v. Commissioner, supra at 904-905; Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 451-452 (1980); Estate of Heckscher v. Commissioner,63 T.C. 485, 493 (1975); Messing v. Commissioner,48 T.C. 502, 512 (1967); Boykin v. Commissioner,T.C. Memo. 1987-134 n. 7. Litigation is an inefficient, wasteful, and inherently imprecise method of resolving these disputes. Symington v. Commissioner, supra.Additionally, we believe *303 that resolution of these issues by settlement or other procedures short of court proceedings will more often result in a value which is fairer to both parties. The parties and their experts will generally have a fuller knowledge of the pertinent facts and greater expertise than does this Court which must rely only on "a cold record and dry briefs" to form the basis of its conclusion. Estate of Heckscher v. Commissioner, supra.
Increased Interest Rate on Substantial Underpayment
Section 6621(c) imposes an increased interest rate on underpayments of tax that are determined to be substantial and that are attributable to tax motivated transactions. The increased rate is 120 percent of that otherwise applicable to income tax deficiencies. Sec. 6621(c)(1). An underpayment is "substantial" for section 6621(c) purposes if it exceeds $ 1,000. Those transactions which are generally considered "tax motivated transactions" are enumerated in section 6621(c)(3)(A). Respondent alleges that subparagraph (i) of section 6621(c)(3)(A), describing a valuation overstatement, *304 is applicable to the facts of this case. That subparagraph incorporates the definition of valuation overstatement contained in section 6659(c). Section 6659(c) defines a valuation overstatement as occurring whenever the value or adjusted basis of a property claimed on a return is 150 percent or more of the amount determined to be the correct value or basis. We have concluded that the correct value of the easement was $ 130,000, rather than the $ 215,000 reported by petitioners on their returns. The $ 215,000 figure is approximately 165 percent of the correct figure of $ 130,000. We therefore hold that the increased rate of interest provided for by section 6621(c) is applicable. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. Sec. 6621(d) was redesignated as sec. 6621(c)↩ by sec. 1511(c)(3)(A)-(C) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2750. 2. This lease was renegotiated on May 1, 1981. The new lease commenced on May 1, 1981, and was for a three-year term. Annual rent was $ 24,000 per annum payable in $ 2,000 monthly installments. The lessee remained liable for utilities, repairs, insurance, and maintenance. Additionally, the lessee was liable for any increase in mortgage interest on the property payable by the Losches during the lease term. ↩
3. See also Thayer v. Commissioner,T.C. Memo. 1977-370↩. 4. Respondent has approved this method of valuation. See Rev. Rul. 76-376, 1976-2 C.B. 53; Rev. Rul. 73-339, 1973-2 C.B. 68. The "before and after" valuation method has also been specifically endorsed by Congress in connection with adoption of the Tax Treatment Extension Act of 1980, Pub. L. 96-541, 94 Stat. 1983; see S. Rept. 96-1007 (1980), 1980-2 C.B. 599, 606. See also Nicoladis v. Commissioner,T.C. Memo. 1988-163↩. 5. At trial, petitioners argued that based on stipulated rental values which differed from those used by Ms. Reynolds the easement resulted in a $ 350,000 loss in value to the property. ↩
6. This reasoning applies with equal force to petitioners' argument that the imposition of the easement results in a diminution in the property's value by foreclosing the possibility of its assemblage with adjacent properties for development. United States v. Powelson,319 U.S. 266, 275-276 (1943); McGovern v. New York,229 U.S. 363, 372↩ (1912). 7. Four of Mr. Horstmann's comparables were also selected by Ms. Reynolds. ↩
8. At trial, Mr. Horstmann acknowledged using an erroneous number of months to calculate appreciation in value over time in adjusting the subject's value to account for the effects of inflation. Had he made this calculation correctly, he would have arrived at a pre-easement value of $ 684,000 or $ 97.55 per square foot of GBA. In converting property values to prices per square foot, we do not reduce the GBA of the property by the area of the coal bin and basement garage, as did Mr. Horstmann. Absent a showing that there was no similar less productive footage in any of the comparables, we find comparisons based on unadjusted GBA to be more appropriate. ↩
9. After adjustment for the error noted in footnote 8, these amounts would be $ 615,600 and $ 68,400, respectively.↩
10. ($ 100,000 / .90) / 5,259 Sq. Ft. = $ 21.13/Sq. Ft. ($ 100,000 / .75) / 5,259 Sq. Ft. = $ 25.35/Sq. Ft. The square footage renovated was 5,259 Sq. Ft. which is the total area of the building exclusive of the basement which was not renovated. ↩
11. These properties had the following square footage of building area exclusive of basement: ↩
1605 New Hampshire
6,840 Sq. Ft.
1607 New Hampshire
14,442 Sq. Ft.
1706 New Hamsphire
8,034 Sq. Ft.
12. An additional test is to inflate the purchase price paid by the Losches for the property to account for appreciation and the value of their renovation. Using Ms. Reynolds' appreciation rates, the $ 360,000 purchase price agreed to in November 1978 would equal $ 604,964 in December 1980. We decline to increase the appreciation of the property for the effects of the zoning change which occurred in the interim. Since the purchase contract was contingent on rezoning, any value attributable to the more advantageous zoning designation would already be reflected in the purchase price. Assuming that Mr. Losch was able to save 25 percent on the costs of renovation by acting as his own general contractor, the $ 100,000 renovation costs would have cost him $ 133,333. Further, assuming that a renovation would add 15 percent more than the cost of the renovation to the value of the renovated property the value added would be $ 156,862 plus the $ 15,000 of air conditioning work for a total of $ 171,862. Thus, using this methodology, the property would be expected to have a value of $ 776,826 on the valuation date.↩
13. Although 1701 New Hampshire was zoned residential, the building had for some time a certificate of occupancy which allowed for use as office space. ↩
14. C-3 zoning designation allows for higher density and a broader range of commercial activities than is allowed in SP designated areas. ↩
15. The $ 164,275 is derived by assuming a cost of $ 36 per square foot for renovation of the building other than the basement. The $ 36 figure represents a 20-percent upward adjustment of the $ 30 figure used in the 1980 sales to account for inflation. ↩
16. Mr. Horstmann's report also discusses the sale of 1606 New Hampshire Avenue. However, at trial he conceded that his report was in error and that no easement was imposed on this property until after its sale. ↩
17. The report actually indicates $ 84,500 of pre-easement net rental value, but contains a $ 100 computational error. ↩
18. At trial, Ms. Reynolds testified that she knew of no reason to prefer one valuation method over the other. She thus split the difference between the $ 350,000 after easement value generated using the income capitalization approach and the $ 635,000 arrived at using the comparable sales approach to arrive at a $ 500,000 after easement value. ↩
19. Mr. Horstmann was of the opinion that rental value of the property could be maximized with installation of an elevator to service its upper floors. Such an improvement would in his opinion raise the annual net rental value of the property to $ 74,742. ↩
20. Mr. Horstmann's actual figure in his report is $ 989; recomputation indicates that his total should be $ 1,034. ↩