[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 03-11975

_____

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**April 16, 2004**
**THOMAS K. KAHN**
**CLERK**

D.C. Docket No. 02-01244-CV-JOF-1

GRAY MURRAY, SAM RAMSEY, KEN HENSON,
MARIAM LEWIS, BUD HARTLEY, individually and
as representatives of a Class of Certificate Holders of
TriCity Hospital Authority Revenue Certificates,

           Plaintiffs-Appellants,

JUSTIN J. KARL, IRA LEE BROWN, FREDERICK C.
FOLLMER, SHARON R. FOLLMER, BOBBY G.
BANKSTON, RALPH B. TRUELOVE, LILLIAN A.
TRUELOVE, PHILIP H. DAVIS,

           Consolidated-Plaintiffs-Appellants,

versus

U.S. BANK TRUST NATIONAL ASSOCIATION,
SOUTHTRUST BANK, f.k.a. Southtrust Bank, N.A.,

           Defendants-Appellees,

RELIANCE TRUST COMPANY,

           Consolidated-Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(April 16, 2004)**

Before ANDERSON, BLACK and HILL, Circuit Judges.

HILL, Circuit Judge:

This is an appeal from a district court order denying the bondholder plaintiffs' motion to certify a class action and dismissing their complaint without prejudice on the grounds that they, as trust beneficiaries, lack standing to bring suit against the three trust fiduciary defendants, or, in the alternative, that as to one trust fiduciary defendant, their case is not yet ripe. Based on the following, we affirm the judgment of the district court.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

In 1993, the Tri-City Hospital Authority (the hospital authority) issued $39,140,000 in bonds and sold them to over one thousand bondholders. The bond

---

[1] We recite the factual background, including the contentions of the parties, that form the basis of the amended complaint and answer. By these recitations, however, we neither pass upon nor intimate any resolution of these conflicting contentions. We refer to them purely to illuminate the circumstances leading up to the dismissal of the amended complaint by the district court. We adjudicate only the propriety, *vel non*, of the dismissal.

issue was governed by a trust indenture.[2] The bondholders were the intended third party beneficiaries of the trust indenture.

The hospital authority loaned $39,140,000 in bond proceeds to the South Fulton Medical Center, Inc. (the medical center) to purchase a separate hospital and its revenues, owned by the hospital authority, and to make necessary capital improvements. In return, as collateral, the medical center gave the hospital authority a security interest in the hospital's personal property, most significantly, its patient account receivables and inventory. Under the terms of the trust indenture, a master trustee was appointed to oversee the transaction and collect payments as they became due. The hospital authority pledged its security interest to the master trustee.

In 2002, individual bondholders filed a seventy-seven page amended complaint against three corporate defendants: (1) U. S. Bank Trust National Association (U. S. Bank), the master trustee of the bonds from November 4, 1999, to the present; (2) SouthTrust Bank (SouthTrust), the former master trustee of the

_____

[2] The term 'trust indenture' collectively refers to the Trust Indenture (dated November 1, 1993, between the Master Trustee and the hospital authority), the Master Trust Indenture (dated November 1, 1993, between the Master Trustee and the medical center), the First Supplemental Master Trust Indenture (dated November 1, 1993, between the Master Trustee and the medical center), the Promissory Note and Form of Promissory Note (dated November 1, 1993, between the Master Trustee and the medical center), and the UCC-1 Financing Statements (filed December 22, 1993).

bonds from October 28, 1996, through November 4, 1999; and (3) Reliance Trust

Company (Reliance), the former servicing agent for the bonds from November 1,

1993, until March 16, 1999. The bondholders sought class certification under Fed.

R. Civ. P. 23(b)(3) or 23(b)(1) and declaratory relief against the defendants, on

behalf of themselves, and a proposed class of over one thousand bondholders, for

violations of the Federal Trust Indenture Act (FTIA), breach of contract, fraud and

misrepresentation, breach of fiduciary duty, and negligence.

At the core of their amended complaint, the bondholders allege that, as to

their secured interest in the hospital's personal property, the defendants failed to

file a UCC-3 continuation statement on December 22, 1998.[3] It is alleged that, on

that date, the perfected security interest that the bondholders held in their bonds

lapsed and they became unsecured creditors, expecting to receive only 30% of the

face value of their bonds.

When U. S. Bank assumed its fiduciary duties, it claims that it was unaware

that the bondholders' perfected security interest had lapsed. In fact, U. S. Bank

---

[3] The security interest was perfected when the original UCC-1 financing statement was filed on December 22, 1993. O.C.G.A. § 11-9-302(1). It was effective for a five-year period. O.C.G.A. § 11-9-403(2). Under Georgia law, once a security interest has been perfected, it must be maintained by the filing of a UCC-3 continuation statement, within six months prior to the expiration of the five year period beginning on the date the original financing statement was filed. O.C.G.A. § 11-9-515. In this case, the UCC-3 was due to be filed anytime from June 22, 1998, to and including December 22, 1998.

4

further claims that, prior to taking control, while performing its final audit, both SouthTrust and Reliance had expressly warranted and represented to it that they had done everything necessary to maintain the perfection.

From November 1999, to April 2000, the medical center had continued to make payments against the promissory note. In April 2000, however, it filed voluntary petitions for bankruptcy under Chapter 11 of the Bankruptcy Code. This was considered an event of default under Section 801 of the bond trust indenture, hence voiding the bondholders' security interest in the collateral.

In October 2001, U. S. Bank, as successor trustee, had filed suit on behalf of the bondholders in the Superior Court of Fulton County, Georgia, alleging breach of fiduciary duty and negligence against SouthTrust and Reliance, for failing to file the UCC-3 continuation statements. It sought damages for the difference between the value of the secured collateral and the amount actually received by the bondholders upon a distribution by the bankruptcy estate. That case is now pending in federal district court.[4]

---

[4] U. S. Bank later dismissed its case pending in state court and refiled that case with the federal district court. Expenses and attorneys' fees are to be paid by the bondholders under the terms of the trust indenture.

In July 2002, the present class action was filed. Here the bondholders, as trust beneficiaries, seek class certification in an effort to replace U. S. Bank as the proper plaintiff against SouthTrust and Reliance in pursuing their lapsed security interest claims. They also seek to add U. S. Bank as a negligent and conflicted defendant, claiming that it had a duty during the thirteen months prior to the bankruptcy filing to discover that the UCC-3 continuation statements had not been filed, and to either cure or mitigate the situation. The bondholders claim that U. S. Bank lacks the incentive to prosecute SouthTrust and Reliance as rigorously as they would.[5]

In rebuttal, U. S. Bank contends that, as the security interest did not lapse on its watch, it has no conflict of interest. Further, U. S. bank argues that, as SouthTrust and Reliance certified that all necessary filings had been done, it relied on those certifications and was under no duty to do more. U. S. Bank claims to have no liability as a joint tortfeasor.[6]

---

[5]   In April 2002, one set of bondholders filed a class action. In May 2002, another set of bondholders filed a class action. The two lawsuits, comprised of thirteen individual bondholder plaintiffs, were consolidated by order of the district court.

[6] The bondholders claim that SouthTrust and Reliance greatly prefer U. S. Bank as the proper party plaintiff in the action filed against them. The bondholders claim there may be substantial affirmative defenses available to South Trust and Reliance, *i.e.,* comparative negligence, avoidance and proximate cause, against U. S. Bank, that would not be otherwise available against the bondholders. *See also* note 13 *infra*.

U. S. Bank contends that, even if affirmative defenses are asserted against it by

The district court denied class certification and dismissed the action by the bondholders against SouthTrust and Reliance. It found that general principles of trust law and the terms of the trust indenture itself expressly provide that U. S. Bank is the proper party with standing to assert claims against third parties on behalf of the trust beneficiaries.

As to the suit by the bondholders against U. S. Bank, the district court denied class certification and dismissed on the grounds that they lacked standing to sue U. S. Bank. In the alternative, in a footnote, the district court held that their claims were unripe until such time as it is determined whether or not the action filed by U. S. Bank against SouthTrust and Reliance would make the bondholders whole.

The bondholders appeal the judgment of the district court.

## II. STANDARD OF REVIEW

---

SouthTrust and Reliance, it still has every incentive to maximize a full recovery for the bondholders in its suit against SouthTrust and Reliance. To the contrary, the bondholders claim that U. S. Bank has every incentive to downplay the amount of damages sustained when the security interest lapsed because, it too, may be liable for such losses. However, U. S. Bank admits that if it does not receive a full recovery, in all likelihood, they will be liable to the bondholders for the shortfall.

Under the trust indenture, twenty-five percent (25%) of the bondholders could demand that U. S. Bank be replaced as trustee. As a practical matter, the bondholders contend that there is not a bank in the country that would voluntarily choose to get involved with the scenario presented here, bankruptcy, lapsed security interests and multiple litigation.

We review orders denying class certification for abuse of discretion. *See*

*Wooden v. Bd. of Regents of the Univ. Sys.*, 247 F.3d 1262, 1271 (11th Cir. 2001),

citing *Prado-Steiman v. Bush*, 221 F.3d 1266, 1278 (11th Cir. 2000).[7]  Nonetheless,

"[w]hether the district court applied the correct legal standard in reaching its

decision on class certification . . . is a legal question that we review *de novo*." *See*

*London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1251 (11th Cir. 2003), citing

*James v. City of Dallas*, 254 F.3d 551, 562 (5th Cir. 2001) (for the proposition that

a district court's decision to deny certification of a class shall only be reversed

---

[7] As artfully explained in *Prado-Steiman*:

Thus, it is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.  "[A]ny analysis of class certification must begin with the issue of standing." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987); *see also Brown v. Sibley*, 650 F.2d 760, 771 (5th Cir. Unit A, July 1981)(stating that the "constitutional threshold [of standing] must be met before any consideration of the typicality of claims or commonality of issues required for procedural reasons by Fed.R.Civ.P. 23.  "Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin*, 823 F.2d at 1482.  It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert.  Rather, "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Id.* at 1483.

*Prado-Steiman*, 221 F.3d at 1280.  Thus, just as a plaintiff cannot pursue an individual claim unless he proves standing, a plaintiff cannot represent a class unless he has standing to raise the claims of the class he seeks to represent. *Id.*

8

upon a showing that the court abused its discretion or that it applied incorrect legal

standards in reaching its decision).

## III.  DISCUSSION

### A.  The Trust Indenture

#### 1.  Section 805

The controlling section of the trust indenture is Section 805, entitled "Right

of [Bondholders] to Institute Suit."[8]  Section 805 prohibits bondholders from suing

---

[8] Section 805 reads in full:

> No owner of any of the [bonds] shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder or on the [bonds] unless (a) such owner previously shall have given to the Trustee written notice of an event of default as hereinabove provided [in Section 801;] (b) the owner, or owners, of 25% of the outstanding principal amount of the [bonds] shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers hereinabove granted, or to institute such action, suit, or proceeding in its name; (c) there shall have been offered to the Trustee security and indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby; and (d) the Trustee shall have refused or neglected to comply with such request within a reasonable period of time; and such notification, request, offer of indemnity and refusal or neglect are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts of this Indenture or for any other remedy hereunder.  The parties hereto intend that no one or more owners of the [bonds] shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Indenture, or to enforce any right hereunder, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the equal benefit of all owners of the outstanding [bonds].
>
> Nothing in this Article contained shall, however, affect or impair the right

third parties unless: (1) they have provided written notice to the Trustee; (2) 25% of the bondholders have made such a request; (3) the bondholders have offered to indemnify the Trustee; and (4) the Trustee nonetheless refuses the request. The three fiduciary defendants argue that the bondholders lack standing to bring suit against them because these four conditions have not been met, and therefore, that they must await the outcome of the action filed on their behalf. If a full recovery is made, the bondholders' alleged claims would be moot.[9]

2.      Section 902

In rebuttal, the bondholders claim that Section 902 of the trust indenture, in essence, trumps Section 805, when the current trustee is also negligent. Although

_____

of any owner of a [bond], which is absolute and unconditional, to enforce the payment of the principal of and interest on such owner's [bonds] out of the moneys provided for such payment, or the obligation of the [hospital authority] to pay the same out of the sources pledged hereto, at the time and place expressed herein.

[9] Clauses such as set forth in Section 805 of the trust indenture are referred to as 'no-action clauses.' *See Cruden v. Bank of New York*, 957 F.2d 961, 967-969 (2d Cir. 1992). As trust indentures commonly vest exclusive power in the indenture trustee to enforce remedial provisions in the event of a default, 'no-action' clauses typically bar bondholders from instituting any judicial proceedings against the obligor unless the indenture trustee refuses to act after being instructed by the requisite number of bondholders specified in the trust indenture, or, if the indenture trustee acts in bad faith, or, has an adverse interest conflicting with its responsibilities under the trust indenture. *Id.; see also Watts v. Missouri-Kansas-Texas R. Co.*, 383 F.2d 571 (5th Cir. 1967). Such 'no-action' clauses have generally been upheld by the courts in order to avoid a multiplicity of lawsuits and to ensure that any litigation will inure for the equal and ratable benefit of all bondholders. *See Friedman v. Chesapeake & O.R.Co.*, 395 F.2d 663 (2d Cir.1968).

Section 902 is over three pages long, the bondholders cite only the following language: "No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct . . . ."[10]

## II.     The Bankruptcy Court Order

The bondholders argue that the trust indenture was terminated by the December 20, 2001, order of the bankruptcy court. They claim, therefore, that any limitation in Section 805 in the trust indenture, such as the 25% rule, on their right to sue third parties has been removed. The order provides in pertinent part:

> The *Master Indenture*, the Certificate Indenture and the [bonds] issued thereunder *shall terminate* as of the effective date . . . *except as necessary to administer the rights, claims, liens, and interests of the Master Trustee, the Certificate Trustee and the [bondholders],* except [they] shall continue in effect to the extent necessary to allow the Master Trustee and the Certificate Trustees to receive distributions pursuant to the Plan . . . and *to the extent necessary to facilitate the Master Trustee's prosecution for settlement of that certain action venued in the Superior Court of Fulton County, Georgia and Captioned U. S. Bank Trust, National Association v. SouthTrust Bank et al . . . .*

---

[10] The bondholders try to buttress this argument by contending that, in addition to Section 902 of the trust indenture, Georgia law specifically and independently authorizes a cause of action against a trustee whose acts and omissions result in injury to another person: "When trust or confidence is reposed in a person in consideration of a payment or promise of a reward to him, negligence in the person trusted which results in injury to the other person shall give the injured party a right of action." O.C.G.A. § 51-1-19.

(Emphasis added).

The district court found that the trust indenture was only partially terminated by the bankruptcy court. It held it was still effective to administer "the rights, claims, liens, and interests of the trustee and the bondholders" and "to facilitate U.S. Bank's suit against SouthTrust and Reliance on behalf of the trust beneficiaries, the bondholders."[11] We agree.

### III. Georgia Trust Law

#### 1. The *Turner* Case

This case is governed by Georgia law. In *Turner v. Trust Co. of Georgia*, 105 S.E.2d 22 (1958), the current trustee filed suit against a former trustee for malfeasance. The trust beneficiaries attempted to sue the former trustee directly. They claimed that the advocacy espoused by the current trustee was deficient in that he wasn't pursuing their case against the third party tortfeasor in the manner that fully represented their interest in the trust estate.

The Supreme Court of Georgia in *Turner* affirmed the restraint of the trust beneficiaries from proceeding further with their suit. It held that, where the

---

[11] The bondholder get the 'nice try of the week' award when they claim that the trust indenture has been fully terminated as the bankruptcy court order only references U. S. Bank's state action, not its later, removed, federal action.

instruments creating the trust confer upon the trustee discretionary power to be exercised according to its judgment, a court of equity will not interfere to control the trustee, acting bona fide, in the reasonable exercise of its discretion. *Turner*, 105 S.E.2d at 26 (citations omitted).[12]  The court also found that the beneficiaries were bound by the result of the suit instituted by the trustee for the benefit of the trust estate. *Id.* at 27(citations omitted).  Their remedy lay against the current trustee if there was a loss. *Id.*  We find *Turner* applies on all fours here.

Both parties agree that *Turner* controls the disposition of this case, but for different reasons.  Both parties cite to the same paragraph of *Turner* as indicative of their position:

> Where the title to property is put in one person for the benefit of others, the latter take *cum onere*.  The skill, ability, and solvency of the trustee operate to their advantage. *But as to acts within the scope of his express or implied powers, they must suffer the consequences when they ultimately prove detrimental to the beneficiaries.*  The remedy in such a case is not to undo what has lawfully been done, but *to proceed against the trustee*, . . . whose personal and financial fitness were passed upon by the grantor when giving the land.  The very instrument which created the estate put forward the trustee as the person who was to represent those interested therein when it became necessary to deal with third persons.

---

[12] The *Turner* court illustrated its rationale using a hypothetical trust with four beneficiaries, each demanding a different course of action. *Turner*, 105 S.E.2d at 28.  The trustee is bound to consider what effect each of the four courses of action will have upon the trust estate and use its best judgment. *Id*.  It would be intolerable if multiple beneficiaries were each trying to do the job given the trustee in the trust indenture.

13

*Turner*, 105 S.E.2d at 27 (emphasis added).

### a. The Contentions of U. S. Bank as to *Turner*

U. S. Bank relies on key language in the paragraph that states that "*they must suffer the consequences when they ultimately prove detrimental to the beneficiaries.*" It claims that the consequences here have not, as yet, been 'ultimately proved detrimental.'

It is undisputed that U. S. Bank has the authority to sue its predecessor trustee for a harm done to the trust estate. Therefore, under *Turner*, when it is acting within the scope of its authority, it must be allowed to complete that action. If that action should *ultimately* prove detrimental to the beneficiaries, then, at that point in time, the beneficiaries *might* have a cause of action, but not before.[13]

### b. The Contention of the Bondholders as to *Turner*

The bondholders rely on the language in the *Turner* paragraph that states that their remedy is "*to proceed against the trustee.*" They interpret that to mean directly and immediately. They argue that, as the *Turner* trustee had no conflict of interest, and, as U. S. Bank in this case does have a conflict of interest, an

---

[13] We have found no case law as to whether or not certain affirmative defenses, such as avoidance, comparative negligence and proximate cause, potentially available against the trustee and not the bondholders, would be sufficient cause to create an exception to the *Turner* rule.

exception to the 'ultimate' language in *Turner* is created, and *Turner* must be read in conjunction with case law dealing with conflicted trustees.

### 2. When the Trustee has a Conflict of Interest

#### a. The *Tate* case

In *Fulton Nat'l Bank v. Tate*, 363 F.2d 562, 570 (5th Cir. 1966), the trustee was allegedly involved in self-dealing, both on his own behalf and in his capacity as trustee, with a third party purchaser. The trustee was allegedly selling trust property at a discount in order to garner a better price for his own property. The Fifth Circuit found that there was such substantial conflict of interest on the trustee's part as, under Georgia law, to shift the burden of proof to the trustee to demonstrate to the court that self-dealing was not present.

#### b. The *Booth* case

In *Booth v. Sec. Mut. Life Ins. Co.*, 155 F. Supp. 755 (D.N.J. 1957), the trustee conspired with third parties to loot the trust estate. It actively participated in the wrongdoing by third parties. The district court found that the trust beneficiaries, and not trustee, were the proper class plaintiffs in a class action against an insurance company for alleged breaches of trust and diversions of trust funds in connection with writing of group insurance for the trust fund.

#### c. The Conflict of Interest Alleged Here

15

The bondholders aver that U. S. Bank has a conflict of interest in its suit against SouthTrust and Reliance because it should have discovered that the UCC-3 statements weren't filed, cured the problem by filing a new ones, and mitigated the damage. We disagree.

What is alleged to have taken place here is not the self-dealing, conspiracy or corruption that were present in *Tate* or *Booth*. The allegation made by the bondholders here is of a separate wrong by U. S. Bank, independent of any action or inaction on the part of SouthTrust and Reliance.

Clearly, U. S. Bank is not a joint tortfeasor. We conclude that any conflict of interest alleged here is not significant enough for us to carve out an exception to the rule of *Turner,* under the auspices of either *Tate* or *Booth*.[14]

### 3. Standing to Sue SouthTrust and Reliance

Therefore, under Georgia trust law, pursuant to the terms of the trust indenture, kept alive in full by the bankruptcy plan of reorganization, U. S. Bank is the party with standing to pursue the claims against SouthTrust and Reliance on

---

[14] U. S. Bank claims it has every incentive to exonerate itself by making a full recovery against SouthTrust and Reliance. To the contrary, the bondholders allege that U. S. Bank has every incentive to downplay the amount of damages incurred as it too may be liable. They claim that U. S. Bank is seeking only two million dollars in damages, when in fact, they claim that the amount is at least six million dollars. The issue of the proper calculation of damages is presently before the district court on a motion for partial summary judgment.

behalf of the trust beneficiaries.  *See Turner*, 105 S.E. 2d at 26.  The issue of the duty of U. S. Bank to act to cure and mitigate will never be adjudicated if it receives a full recovery from the third party tortfeasors.  *Id.*  The bondholders will be bound by the result and their remedy will then be against U. S. Bank if there is a loss.  *Id.* at 27.

### 4.  Ripeness and the Statute of Limitations as to U. S. Bank

If and when U. S. Bank  receives less than a full recovery, then and only then, will any potential cause of action against it by the bondholders ripen and accrue.  *See Turner*, 105 S.E.2d at 27.  At that time, the statute of limitations will begin, and the bondholders will have their claim, as the actions taken by the trustee, within the scope of its express or implied powers, *have ultimately proved detrimental to them, the trust beneficiaries*.  *Id.*  The merits of the issue presented, whether or not U. S. Bank had a duty to act to cure and mitigate, will then be before a different court.

### IV.  CONCLUSION

Based upon the foregoing, we affirm the judgment of the district court. AFFIRMED.